STATE of Tennessee

v.

Andrew THOMAS, et al.

Supreme Court of Tennessee,
at Jackson.

Nov. 10, 2004 Session.

March 4, 2005.

Adolpho A. Birch, Jr., J., filed opinion concurring in part and dissenting in part.

Michael E. Scholl and Robert C. Brooks, Memphis, Tennessee, for the Appellant, Andrew Thomas.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Jennifer Nichols, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

The defendant, Andrew Thomas, was convicted of felony murder. In imposing a death sentence, the jury found that evidence of one aggravating circumstance, i.e., the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person, outweighed the evidence of mitigating circumstances beyond a reasonable doubt. The Court of Criminal Appeals affirmed the conviction and the death sentence, and the case was automatically docketed in this Court. We entered an order identifying three issues for oral argument and now hold as follows: (1) the

trial court did not err in excusing a prospective juror for cause; (2) the trial court erred in refusing to instruct the jury on lesser included offenses of felony murder but the error was harmless beyond a reasonable doubt; and (3) the death sentence was not arbitrary, excessive, or disproportionate. We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion. Accordingly, the Court of Criminal Appeals' judgment is affirmed.

The defendant, Andrew Thomas, and his co-defendant, Anthony Bond, were indicted for the felony murder of the victim, James Day. The following evidence was presented at the joint trial of the defendant and Bond.[1]

### Guilt Phase

Shortly after 12:30 p.m. on April 21, 1997, the defendant and his co-defendant, Bond, saw an armored truck guard with a money deposit bag leaving a Walgreens drug store on Summer Avenue in Memphis, Tennessee. The defendant ran up, shot the guard in the back of the head, grabbed the deposit bag, and jumped into a white car being driven by Bond. The defendant and Bond abandoned the white car on a street behind Walgreens, got into a red car that the defendant had borrowed from his girlfriend, and drove away.

Betty Gay, a Walgreens' employee, heard the gunshot and then saw the armored truck guard, James Day, lying in the parking lot. She saw a man running from the scene with a gun and the deposit bag.[2] Charles Young, the assistant man-

---

1. Bond was convicted of felony murder and sentenced to life imprisonment; however, his conviction was reversed by the Court of Criminal Appeals based on the trial court's failure to charge the jury on the lesser included offense of facilitation of felony murder. The

State's application for permission to appeal was denied on August 30, 2004. Accordingly, Bond's appeal is not before this Court.

2. Gay testified that the deposit bag contained $18,843.01 in cash, checks, and food stamps.

ager of Walgreens, ran outside and saw Day lying face down in a pool of blood. Day, who was conscious, told Young, "Call my wife." Day remained conscious and continued to talk until an ambulance arrived.

Several witnesses described the cars used by the defendant and Bond and gave descriptions of the occupants to the police. One witness, Richard Fisher, testified that he saw a white car "speed" around the armored truck in the front of the store and that the car was within four feet of him. Fisher later identified the defendant as the passenger in the white car.

Later on the afternoon of April 21st, the defendant and Bond arrived at the apartment of Angela Jackson, who was then the defendant's girlfriend. According to Jackson, the two men were "excited" and "out of breath." After telling Bond to get rid of the gun, the defendant began taking money, checks, and food stamps from small white envelopes that had been in Bond's jacket. The defendant and Bond divided the money.

Jackson testified that later that same day, the defendant bought a customized car with gold plates and spoke wheels for $3,975 in cash. The car was titled in Jackson's name. Afterward, the defendant told Jackson that they needed to get a hotel room. While watching a news report that evening at the hotel about the shooting, the defendant told Jackson that the victim "did not struggle for his life" and that he had "grabbed the nigger by the throat and shot him."

On the day after the shooting, Jackson opened a bank account in her name and deposited $2,401.48 in cash. Two days later, she bought a shotgun because the defendant said they needed it "for protection." According to Jackson, the defendant later bought a gold necklace for himself and wedding rings for both of them.

After getting married in May, the couple separated two months later. The defendant told Jackson not to tell police about the robbery.

The victim, James Day, did not immediately die from the gunshot wound to the back of his head. Instead, the gunshot damaged his spinal cord and resulted in paraparesis (a profound weakness in one's abdomen and legs) and neurogenic bladder (a loss of bladder and bowel control due to nerve damage). Faye Day Cain, the victim's widow, testified that her husband underwent numerous surgeries, needed constant care and medical attention, and was unable to work. He was confined to one room, was unable to use the bathroom, and became depressed. In late September of 1999, Day was rushed to the hospital for emergency surgery after his bladder ruptured. The condition caused an infection; Day's condition continued to worsen, and he finally died on October 2, 1999.

The medical examiner for Shelby County, Tennessee, Dr. O.C. Smith, testified that the cause of Day's death was sepsis, "secondary to the rupture of his bladder resulting from spinal cord injury caused by the gunshot wound to his head." Dr. Smith considered Day's death a homicide, and he stated that the "infection from the ruptured bladder" could be "directly related back to [the] gunshot wound." Dr. Smith conceded that Day suffered from heart disease, high blood pressure, diabetes, and obesity, but he stated that these conditions did not cause the death. Dr. Smith's assistant, Dr. Cynthia Gardner, likewise testified that Day's death resulted from the injuries caused by the gunshot wound.

A videotape of the shooting captured by Walgreens' surveillance cameras was played for the jury. A videotape made from the original was also played for the

jury at a slower speed. Angela Jackson identified the defendant as the gunman who shot the guard in the back of the head from a still photograph that had been made from the videotape.

After considering the evidence, the jury convicted the defendant of felony murder based on the killing of the victim "during an attempt to perpetrate robbery as charged in the indictment." The trial court then held a sentencing hearing for the jury to determine the punishment.

## Penalty Phase

To support the prior violent felony aggravating circumstance, the prosecution introduced evidence that the defendant had prior convictions for felony offenses whose statutory elements involved the use of violence to the person. See Tenn.Code Ann. § 39–13–204(i)(2) (2003). The proof showed that in September of 1994, the defendant was convicted of seven counts of aggravated robbery and one count of robbery. In January of 1994, the defendant was convicted of one count of aggravated robbery.

The indictments underlying the defendant's prior convictions for aggravated robbery revealed that the offenses involved the defendant's use of a firearm and involved different victims. On January 4, 1993, he used a firearm in taking between $1,000 and $10,000 from Michael Osborne. On February 1, 1993, he used a firearm in taking between $1,000 and $10,000 from Booker Sanders, and he used a handgun in taking money and food stamps totaling $1,000 to $10,000 from Lee Harris. On March 8, 1993, he used a firearm in taking money and checks totaling $500 to $1,000 from Amos Kirby. On March 12, 1993, he used a firearm in taking checks valued under $500 from Carl Hutchinson. On March 15, 1993, he used a firearm in taking money and checks totaling $500 to

$1,000 from Onie Massey, and he used a firearm in taking between $500 and $1,000 from Dewayne McCoy. On June 25, 1993, he used a pistol in taking jewelry valued at $1,000 to $10,000 from Gary Smallwood.

The prosecution also introduced the testimony of Faye Day Cain, the widow of the victim, James Day. She testified that her husband had worked two jobs to support his family before he was shot and that she was unable to work due to a medical condition known as thrombophlebitis. She testified that since her husband's death, she and the couple's minor son lived on disability payments and social security benefits. Ms. Cain testified that the victim had been her husband, confidant, lover, and best friend. After the shooting, however, she and her husband could no longer have physical contact or intimacy. The victim "couldn't stand to be touched" and "the least little noise would turn him into a frenzy." She testified that she had suffered great emotional pain, that she was no longer a happy person, and that she cried often.

According to Ms. Cain, the couple's son, Cedric, was twelve when his father was shot. They had enjoyed riding motorcycles, having breakfast, and doing "father and son" things. After the shooting, however, Cedric became "hurt and angry."

After the prosecution rested, the defendant presented evidence of mitigating circumstances. The defendant's mother, Luella Barber, testified that the defendant was born in February of 1973. She said the defendant's father, Andrew Thomas, Sr., did not visit the family regularly; he abused drugs, abused her in the defendant's presence, and was often in jail. Ms. Barber divorced Andrew Thomas, Sr., in 1977, and she later married William Barber. She said that the defendant's stepfather, Barber, also abused her in front of

the children and became involved with drugs.

According to Ms. Barber, the defendant started getting into trouble for stealing when he was fourteen. Although the defendant dropped out of school, he received his GED and a certificate as a residential plumber's helper while in jail. Ms. Barber said that she loved her son and that her life would not be the same without him.

Several other family members also testified on behalf of the defendant. Alacia Bolden, the mother of the defendant's eight-year-old son, testified that their son loved his father and continued to have a close relationship with him. Andre Barber, the defendant's brother, testified that he had always looked up to the defendant, that they had a close relationship, and that they talked often. He said that losing the defendant would "devastate" their mother. Similarly, Stephanie Williams and Tamara Weeks, the defendant's cousins, testified that they had close relationships with the defendant. Williams said that she did not want to see the defendant die, and Weeks believed that the defendant was an important male figure in his son's life despite his incarceration.

The jury imposed the death penalty after finding that the evidence supporting the sole aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt. On appeal, the Court of Criminal Appeals affirmed the conviction and the death sentence after concluding that twenty-two issues raised by the defendant were without merit.

## ANALYSIS

### Excused Prospective Juror

We first review the defendant's argument that the trial court erred in excusing a prospective juror, Gary Pannell, based on his views regarding the death penalty. The State maintains that the trial court properly excused Pannell based on his statements and views about imposing a death sentence.

To place this issue into context, we will include the portions of the voir dire with respect to this prospective juror. First, the exchange between the assistant district attorney general and the prospective juror:

Q. Mr. Pannell, same question to you, if the State of Tennessee proves the aggravating circumstances, beyond a reasonable doubt, and proves that they weigh more than the mitigators, again, beyond a reasonable doubt, can you sentence one or both of the defendants to death?

A. I really don't think so.

. . . .

A. I had a hard time dealing with it last night, soul searching and everything.

Q. All right.

A. And there have been articles in the paper recently about planted evidence and stuff like that, that it makes it hard for me to say that I would agree to a death sentence on something I didn't witness myself.

Q. That's fine.

A. Or to hear the person charged with the crime to personally admit to it himself.

Q. All right. So you couldn't follow the law in the State of Tennessee if what I have told you would be the law that you would have to follow according to [Judge] Dailey's instructions?

A. Well, you know you have to listen to witnesses.

Q. Yes, sir.

A. Okay. And that's where I would have a problem, is taking what they are saying, and saying, "Okay, what they are saying is true," which I don't know—

Q. All right.

A. And to me, death is—it's a permanent thing.

Q. Yes, sir. Thank you.

A. You don't come back with it.

Q. Thank you.

After the prosecution moved to excuse the prospective juror for cause, counsel for the defendant asked the following questions:

Q. Sir, let me ask you this: Are there circumstances where you feel you could give the death penalty? You mentioned you wouldn't feel comfortable doing it unless you actually saw it or unless you heard someone admit to it. Are there circumstances where you could give that punishment?

A. That's the only two that I can thin[k] of right now.

Q. So there are some circumstances where you could give that punishment if it actually showed; is that correct?

A. That's right.

Q. I have no further questions, Your Honor.

Finally, the trial court had the following exchange with the prospective juror:

Q. So you're not foreclosing the possibility of giving the death penalty. Is that correct, Mr. Pannell?

A. That's correct.

Q. You're just stating that you would have to see sufficient proof to satisfy you that the aggravating circumstances outweigh the mitigating circumstances.

A. Sufficient proof in my eyes would be what I witnessed myself or what the person charged with the crime—if they said that they did it, yes, I could go along with it.

Q. Let me ask you this: If you felt that the state had proven the aggravating circumstance that they allege—you're satisfied that they have proven that and that it outweighed the mitigation—the mitigating circumstances—but neither of these criteria that you set forth existed, are you saying, then, that even though you felt that the state had proven their aggravating circumstances, you still could not follow the law and impose the death penalty?

A. (No audible response)

Q. Do you follow what I'm saying?

A. (No audible response)

Q. You set up two criteria that you say are the only two by which you could consider voting for the death penalty, and I'm saying what happens if, in your mind, if you determine that the state has proven, beyond a reasonable doubt, the existence of the aggravating circumstance they allege, and you further find, in your mind, that that aggravating circumstance does, indeed, outweigh, beyond a reasonable doubt, any mitigating circumstances that have been presented—if you find that the law had been satisfied in that regard as it's set up by the legislature, but you find that these two circumstances that you set forth aren't part of this process—don't exist in this process, are you saying that because of that, you could not go forward an[d] impose the death penalty?

A. I would have a hard time taking what I would hear coming from wit-

nesses' accounts and everything because, just like I said, just last week in the paper about some incidents down in Florida—

Q. Well, we wouldn't want to get into what was in the paper because we don't try cases in the paper or on TV.

A. Okay. It's planted evidence—

Q. Well—

A. —people can say anything—

Q. Okay. Thank you, Mr. Pannell....

After the State renewed its challenge to the prospective juror for cause, the trial court heard arguments from the parties. The trial court then excused the prospective juror for cause after concluding:

I think that his responses, in their totality—he, at best, has given some sort of qualified statement that he could, under his own perceived limited circumstances follow the law; and under the law, that's not good enough. He conceded that if the state proved what they were required to prove under the statute but it didn't meet his self-appointed criteria, then he couldn't go forward and follow the law. And I don't think that's what our system requires of a juror. And I— that's just the way he feels, and that's fine; but I'll note your exception. I'm going to go ahead and excuse him.

■ The principles governing a trial court's decision to excuse a prospective juror challenged for cause are set out as follows. Under *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), prospective jurors may be excused for cause only if their views about the death penalty would "prevent or substantially impair" the performance of their duties as a juror in accordance with their instructions and their oath. *See also State v. Hutchison,* 898 S.W.2d 161, 167 (Tenn. 1994). However, a juror's bias need not be

proven with "unmistakable clarity" to justify a challenge for cause. *Id.*

■ A trial court must have the "definite impression that a prospective juror could not follow the law." *Hutchison,* 898 S.W.2d at 167; *see Wainwright,* 469 U.S. at 425–26, 105 S.Ct. 844. A trial court's findings "are accorded a presumption of correctness, and the [defendant] must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision." *State v. Austin,* 87 S.W.3d 447, 473 (Tenn.2002); *see also State v. Alley,* 776 S.W.2d 506, 518 (Tenn.1989); *State v. Duncan,* 698 S.W.2d 63, 71 (Tenn.1985).

A review of these principles as applied illustrates the broad discretion afforded to the trial court. In *Wainwright,* for instance, the Supreme Court concluded that a prospective juror was properly excused where she was "afraid" or "thought" that her views against the death penalty may interfere with her ability to determine the defendant's guilt. 469 U.S. at 426, 105 S.Ct. 844. In *Austin,* this Court agreed that the trial court had properly excused several prospective jurors who indicated that they would not consider or did not "believe" in imposing the death penalty. 87 S.W.3d at 473. In *Duncan,* a case very similar to the present case, this Court held that a prospective juror was properly excused where she believed that she could not impose the death penalty "unless she saw the crime committed," and where she stated that she did not want to "judge another human being on the basis of what one says against what another person says." 698 S.W.2d at 71; *see also Alley,* 776 S.W.2d at 517–18 (prospective juror excused where he was "not sure" he could consider the death penalty).

■ In our view, the defendant has not met the burden of establishing by convincing evidence that the trial court erred in

excusing prospective juror Pannell for cause. The prosecutor extensively questioned Pannell as to whether he could apply the law to the evidence and consider all forms of punishment in this case. Pannell consistently indicated that it would be "hard for [him] to say" that he would impose the death penalty for a crime he did not witness or for a crime to which the defendant had not confessed. *Cf. Duncan,* 698 S.W.2d at 71. In response to additional questioning by defense counsel, Pannell reiterated that he could impose the death penalty only in those circumstances where he had witnessed the crime or heard a defendant's confession. Finally, Pannell answered the trial court's questions by saying that he could not follow the law as to aggravating and mitigating circumstances unless his own criteria were satisfied.

In sum, the prospective juror was questioned extensively by both parties and the trial court. The trial court gave defense counsel ample opportunity to rehabilitate the prospective juror and gave full consideration to the arguments of the parties. The trial court asked its own questions to further explore the prospective juror's views. Accordingly, we conclude that the trial court did not err in excusing prospective juror Pannell.

### *Lesser Included Offenses*

We next address the defendant's argument that the trial court committed re-versible error in failing to instruct the jury on the lesser included offenses of felony murder, i.e., second degree murder, reckless homicide, and criminally negligent homicide.[3] The State concedes that the trial court erred in failing to instruct the jury on these lesser included offenses, but it asserts that the trial court's error was harmless beyond a reasonable doubt.[4]

■■■ An instruction on a lesser included offense must be given if the trial court, viewing the evidence most favorably to the existence of the lesser included offense, concludes (a) that "evidence exists that reasonable minds could accept as to the lesser included offense," and (b) that the evidence "is legally sufficient to support a conviction for the lesser-included offense." *State v. Burns,* 6 S.W.3d 453, 469 (Tenn. 1999). The failure to instruct the jury on lesser included offenses requires a reversal for a new trial unless a reviewing court determines that the error was harmless beyond a reasonable doubt. *State v. Ely,* 48 S.W.3d 710, 727 (Tenn.2001). In making this determination, the reviewing court must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." *State v. Allen,* 69 S.W.3d 181, 191 (Tenn.2002).

This Court has previously held that second degree murder, reckless homicide, and

---

**3.** Felony murder requires, in relevant part, evidence of "a killing of another committed in the perpetration of or attempt to perpetrate any ... robbery...." Tenn.Code Ann. § 39-13-202(a)(2) (2003). Second degree murder requires evidence of "[a] knowing killing of another." Tenn.Code Ann. § 39-13-210(a) (2003). Reckless homicide requires evidence of "a reckless killing of another." Tenn.Code Ann. § 39-13-215(a) (2003). Criminally negligent homicide requires evidence that criminally negligent conduct "results in death." Tenn.Code Ann. § 39-13-212(a) (2003).

**4.** The State asserts that the trial court did not err in failing to instruct the jury on the offense of facilitation of felony murder because there was no evidence to support such an instruction. *See State v. Ely,* 48 S.W.3d 710, 724 (Tenn.2001) (evidence did not warrant an instruction on the lesser included offense of facilitation). The defendant in this case has not raised an issue as to facilitation as a lesser included offense in his brief.

criminally negligent homicide are lesser included offenses of felony murder. *Ely,* 48 S.W.3d at 721. We explained:

> After comparing the respective elements of felony murder, second degree murder, reckless homicide, and criminally negligent homicide, it appears that the elements of the lesser offenses are a subset of the elements of the greater and otherwise differ only in the mental state required. We hold that because the mental states required for the lesser offenses differ only in the level of culpability attached to each in terms of seriousness and punishment, the offenses of second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder under part (b) of the *Burns* test.

*Id.* at 721–22.

■ We conclude, and the State concedes, that the record in this case demonstrates that the trial court erred in failing to instruct the jury on second degree murder, reckless homicide, and criminally negligent homicide. There was evidence that reasonable minds could accept as to these lesser included offenses, and the evidence was legally sufficient to support a guilty verdict on these lesser included offenses. *See id.* at 724–25 (holding that the trial court erred in failing to instruct on the lesser included offenses to felony murder); *see also Burns,* 6 S.W.3d at 467.

■ We further conclude, however, that the trial court's failure to instruct on these lesser included offenses was harmless beyond a reasonable doubt. The evidence at trial revealed that the defendant shot the victim, an armored truck guard, in the back of the head and stole the victim's Walgreens money deposit bag. The defendant was identified as one of two men fleeing from the scene in a white car. The defendant's criminal conduct was filmed by a surveillance camera, and the videotape of the crime was played for the jury. The defendant's ex-wife, Angela Jackson, identified the defendant from a still photograph made from the videotape. The defendant later divided the contents of the money deposit bag with his co-defendant, Anthony Bond, and he told Jackson that he had shot the guard. The testimony established that the victim suffered extensive injuries and later died as a result of these injuries. In sum, the evidence overwhelmingly established the elements of felony murder, i.e., the defendant's killing of another in the perpetration of a robbery. *See* Tenn.Code Ann. § 39–13–202(b) (2003).

Moreover, the defendant's theory of defense was two-fold: (1) that he was not involved in the robbery, and (2) that the gunshot wound did not cause the victim's death. *See Allen,* 69 S.W.3d at 191 (reviewing court should analyze the defendant's theory of defense). The defendant did not concede that he was involved in the crime, and he did not argue that he was guilty of a lesser included offense or attempt to establish that he was guilty of a lesser included offense. *Compare id.* at 191–92 (theory of defense, in part, was that the defendant lacked the required mental state for the offense). In sum, we agree with the Court of Criminal Appeals' conclusion that the jury could not reasonably have concluded that the defendant was guilty of anything other than a killing in the perpetration of a robbery, i.e., felony murder.

Accordingly, we hold that the trial court erred in failing to instruct the jury on the lesser included offenses of felony murder but that the error was harmless beyond a reasonable doubt.

### Proportionality

■ Where a defendant has been sentenced to death, we must apply a compara-

tive proportionality analysis pursuant to Tennessee Code Annotated section 39–13–206(c)(1)(D) (2003). The analysis is intended to identify aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is " 'disproportionate to the punishment imposed on others convicted of the same crime.' " *State v. Bland,* 958 S.W.2d 651, 662 (Tenn.1997) (quoting *Pulley v. Harris,* 465 U.S. 37, 42–43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)).

█ In conducting this analysis, this Court employs the precedent-seeking method of comparative proportionality review, in which we compare a case with other cases involving similar defendants and similar crimes. *See Bland,* 958 S.W.2d at 665–67. While no defendants or crimes are alike, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Id.* at 668.

We have repeatedly held that the pool of cases considered by this Court in its proportionality review includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. *See State v. Godsey,* 60 S.W.3d 759, 783 (Tenn.2001). We have explained that the pool does not include first degree murder cases in which a plea bargain is reached with respect to the punishment or in which the State does not seek the death penalty:

[C]onsideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. We previously have declined to review the exercise of prosecutorial discretion, and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying *potential* capital cases.

*Id.* at 784 (citations omitted).

█ Accordingly, our comparative proportionality review of the applicable pool of cases considers numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. *Bland,* 958 S.W.2d at 667. We also consider numerous factors about the defendant: (1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *Id.; see also State v. Bane,* 57 S.W.3d 411, 428–29 (Tenn.2001).

█ In this case, the evidence showed that the defendant shot the victim in the back of his head and stole the victim's Walgreens money deposit bag. The defendant was identified as one of two men fleeing from the scene, and the shooting was filmed by a surveillance camera and shown to the jury. Angela Jackson identified the defendant as the shooter from a still photograph made from the videotape. The defendant later divided the contents of the deposit bag with his co-defendant, and he told Jackson that he killed the guard. The evidence established that the victim suffered extensive injuries and suffered

extreme pain and disability from these injuries for over two years before his death.

The evidence also showed that the defendant was twenty-four years old at the time of this offense. He had eight prior convictions for aggravated robbery and a conviction for robbery. As discussed above, the prior aggravated robbery offenses took place from January to June of 1993 and involved the defendant's use of a firearm and several different victims. On January 4, 1993, for instance, the defendant used a firearm in taking between $1,000 and $10,000 from Michael Osborne. On February 1, 1993, he used a firearm in taking between $1,000 and $10,000 from Booker Sanders, and he used a handgun in taking money and food stamps totaling $1,000 to $10,000 from Lee Harris. On March 8, 1993, he used a firearm in taking money and checks totaling $500 to $1,000 from Amos Kirby. On March 12, 1993, he used a firearm in taking checks valued under $500 from Carl Hutchinson. On March 15, 1993, he used a firearm in taking money and checks totaling $500 to $1,000 from Onie Massey, and he used a firearm in taking $500 to $1,000 from Dewayne McCoy. Finally, on June 25, 1993, he used a pistol in taking jewelry valued at $1,000 to $10,000 from Gary Smallwood.

The defendant played the major role in the present case by shooting the victim and stealing the victim's deposit bag. The defendant told the co-defendant to get rid of the gun he had used to shoot the victim. The defendant showed absolutely no remorse for the offense; indeed, he divided the money with his co-defendant and immediately went on a shopping spree, buying a car, jewelry, and wedding rings. He told Angela Jackson that "the victim did not struggle for his life" and that "he grabbed the nigger by the throat and shot him."

The defendant offered mitigating evidence regarding his family background from his mother, brother, and cousins. The defendant rarely saw his father as a child, and his father had been involved in drugs. The defendant's father and his stepfather abused the defendant's mother. The evidence showed that the defendant had the support of his family members, including his minor son, and that he had earlier earned his GED while in prison. There was no evidence, however, that the defendant had any physical, mental, or emotional difficulties that impaired his judgment or mitigated the offense he committed in any other way.

After reviewing the record, we conclude that the evidence in this case clearly supported the jury's finding that the aggravating circumstance, i.e., that the defendant had prior convictions for felonies whose elements involved violence to the person, was proven beyond a reasonable doubt. Similarly, the evidence supported the jury's finding that the evidence of this aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39–13–206(c)(1)(B) (2003).

We also conclude that the death sentence as applied to the defendant in this case was not arbitrary, excessive or disproportionate when compared to defendants in other cases. *See* Tenn.Code Ann. § 39–13–206(c)(1)(A), (C), and (D) (2003).

This Court has upheld the death sentence in similar cases where the defendant shot a victim at close range. *See State v. McKinney*, 74 S.W.3d 291, 312 (Tenn. 2002); *State v. Henderson*, 24 S.W.3d 307, 310 (Tenn.2000); *State v. Cribbs*, 967 S.W.2d 773, 777 (Tenn.1998). Similarly, this Court has upheld the death penalty in numerous cases in which the victim was shot in the course of a robbery or other felony offense. In *State v. Reid*, 91

S.W.3d 247, 260 (Tenn.2002), for instance, the defendant received the death penalty for shooting two victims in the course of a robbery. In *State v. Stout,* 46 S.W.3d 689, 693–94 (Tenn.2001), the defendant was sentenced to death for kidnapping the victim and shooting her in the head. Similarly, in *State v. Sims,* 45 S.W.3d 1, 5–6 (Tenn.2001), the defendant was sentenced to death for shooting the victim in the course of a burglary. *See also State v. Smith,* 993 S.W.2d 6, 18 (Tenn.1999) (victim shot during robbery); *State v. Howell,* 868 S.W.2d 238, 262 (Tenn.1993) (victim shot in the head during robbery); *State v. Boyd,* 797 S.W.2d 589, 595 (Tenn.1990) (victim shot during robbery).

In addition, this Court has upheld numerous death sentences in cases involving a defendant with previous convictions for felonies whose statutory elements involved the use of violence to the person, i.e., the aggravating circumstance in this case. *See, e.g., Reid,* 91 S.W.3d at 287; *McKinney,* 74 S.W.3d at 312; *Stout,* 46 S.W.3d at 694; *Sims,* 45 S.W.3d at 19–20; *State v. Bates,* 804 S.W.2d 868, 882–83 (Tenn.1991). As this Court has said, this aggravating circumstance is "more qualitatively persuasive and objectively reliable than other[ ]" aggravating circumstances. *Howell,* 868 S.W.2d at 261. Indeed, we have upheld the death sentence in cases in which this was the sole aggravating circumstance found by the jury. *See McKinney,* 74 S.W.3d at 312; *State v. Chalmers,* 28 S.W.3d 913, 919 (Tenn.2000); *State v. Keough,* 18 S.W.3d 175, 184 (Tenn.2000).

Finally, we note that numerous death penalty cases involved defendants who presented evidence of mitigating circumstances substantially similar to that presented by the defendant in this case. For example, several cases have involved defendants who were a similar age as the defendant. *See State v. Davis,* 141 S.W.3d 600, 621 (Tenn.2004); *State v. Pike,* 978 S.W.2d 904, 922 (Tenn.1998); *Bland,* 958 S.W.2d at 674. Likewise, numerous defendants have presented mitigating evidence of their backgrounds, poor childhood environments, parents who used drugs, and similar circumstances. *Davis,* 141 S.W.3d at 621; *Stout,* 46 S.W.3d at 708; *Henderson,* 24 S.W.3d at 318; *Bland,* 958 S.W.2d at 670.

Our task does not require a finding that this case is exactly like a prior case in every respect, nor does it require a determination that this case is "more or less" like other similar death penalty cases. *See McKinney,* 74 S.W.3d at 313. Instead, we must identify aberrant death sentences by determining whether a case plainly lacks circumstances similar to those cases in the relevant pool of cases in which a death sentence has been upheld. *Id.* Accordingly, the death sentence in this case is not arbitrary, excessive, or disproportionate.

## CONCLUSION

After reviewing the entire record and applicable authority, we hold: (1) the trial court did not err in excusing a prospective juror for cause; (2) the trial court erred in refusing to instruct the jury on lesser included offenses of felony murder, but the error was harmless beyond a reasonable doubt; and (3) the death sentence was not arbitrary, excessive, or disproportionate. We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix. Accordingly, the Court of Criminal Appeals' judgment is affirmed.

The defendant's sentence of death shall be carried out on the 10th day of August, 2005, unless otherwise ordered by this Court or other proper authority. It ap-

pearing that the defendant is indigent, costs of the appeal are taxed to the State.

ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

I concur in the conclusion of the majority that Thomas's conviction should be affirmed. As to the sentence of death, however, I respectfully dissent. As I have previously expressed in a long line of dissents, I believe that the comparative proportionality review protocol currently embraced by the majority is inadequate to shield defendants from the arbitrary and disproportionate imposition of the death penalty. *See* Tenn.Code Ann. § 39–13–206(c)(1)(D) (1995 Supp.). I have consistently expressed my displeasure with the current protocol since the time of its adoption in *State v. Bland*, 958 S.W.2d 651 (Tenn.1997). *See State v. Robinson*, 146 S.W.3d 469, 529 (Tenn.2004) (Birch, J., concurring and dissenting); *State v. Leach*, 148 S.W.3d, 42, 68 (Tenn.2004) (Birch, J., concurring and dissenting); *State v. Davis*, 141 S.W.3d 600, 632 (Tenn.2004) (Birch, J., concurring and dissenting); *State v. Berry*, 141 S.W.3d 549, 589 (Tenn.2004) (Birch, J., concurring and dissenting); *State v. Holton*, 126 S.W.3d 845, 872 (Tenn.2004) (Birch, J., concurring and dissenting); *State v. Davidson*, 121 S.W.3d 600, 629–36 (Tenn.2003) (Birch, J., dissenting); *State v. Carter*, 114 S.W.3d 895, 910–11 (Tenn. 2003) (Birch, J., dissenting); *State v. Reid*, 91 S.W.3d 247, 288–89 (Tenn.2002) (Birch, J., concurring and dissenting); *State v. Austin*, 87 S.W.3d 447, 467–68 (Tenn.2002) (Birch, J., dissenting); *State v. Stevens*, 78 S.W.3d 817, 852 (Tenn.2002) (Birch, J., concurring and dissenting); *State v. McKinney*, 74 S.W.3d 291, 320–22 (Tenn. 2002) (Birch, J., concurring and dissenting); *State v. Bane*, 57 S.W.3d 411, 431–32 (Tenn.2001) (Birch, J., concurring and dissenting); *State v. Stout*, 46 S.W.3d 689, 720 (Tenn.2001) (Birch, J., concurring and dissenting); *Terry v. State*, 46 S.W.3d 147, 167 (Tenn.2001) (Birch, J., dissenting); *State v. Sims*, 45 S.W.3d 1, 23–24 (Tenn. 2001) (Birch, J., concurring and dissenting); *State v. Keen*, 31 S.W.3d 196, 233–34 (Tenn.2000) (Birch, J., dissenting). As previously discussed, I believe that the problem with the current proportionality analysis is threefold: (1) the proportionality test is overbroad,[1] (2) the pool of cases used for comparison is inadequate,[2] and (3) review is too subjective.[3] These flaws seriously undermine the reliability of the current proportionality protocol. *See State v. Godsey*, 60 S.W.3d at 793–800 (Birch, J., concurring and dissenting). In my view, the current comparative proportionality protocol is woefully inadequate to protect defendants from the arbitrary or dispro-

1. On April 29, 1997, eight days after Defendant Thomas shot Mr. Day, this statute was amended to provide that this Court "shall not set aside a sentence of death ... on the ground that the trial court did not specifically instruct the jury as to a requested mitigating factor that is not ennumerated in subsection (j)." Tenn.Code Ann. § 39–13–204(e)(1) (1997); *see also State v. Hall*, 958 S.W.2d 679, 694–95 (Tenn.1997).

2. "This Constitution [of the United States of America], and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const. Art. 6[2.].

3. The Seventh Circuit did note, however, that "[t]he practice of allowing the prosecutor to choose the grand jury and hence the trial judge is certainly unsightly" and "lack[s] the appearance of impartiality." 50 F.3d at 442.

portionate imposition of the death penalty.[4] Accordingly, I respectfully dissent from that portion of the majority opinion affirming the imposition of the penalty of death.

### APPENDIX

(Excerpts from the Court of Criminal Appeals' Decision)

### IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT JACKSON

November 4, 2003 Session

STATE OF TENNESSEE v. ANDREW THOMAS AND ANTHONY BOND

Direct Appeal from the Criminal Court for Shelby County, No. 00–03095; Joseph B. Dailey, Judge

No. W2001–02701–CCA–R3–DD– Filed February 27, 2004

Defendants Andrew Thomas and Anthony Bond appeal as of right their convictions for the first degree felony murder of Loomis Fargo employee, James Day, during the perpetration of a robbery. Following a separate sentencing hearing, the jury found, as to each defendant, that the proof supported one aggravating circumstance beyond a reasonable doubt, that is, the defendant had been previously convicted of one or more violent felonies. *See* Tenn.Code Ann. § 39–13–204(i)(2). With respect to Defendant Thomas, the jury further determined that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt, and sentenced Defendant Thomas to death. As to Defendant Bond, the jury found that the aggravating circumstance did not outweigh the mitigating circum-

stances and imposed a sentence of life without the possibility of parole. The trial court approved the sentencing verdicts. In this appeal as of right, Defendant Thomas raises the following issues for this Court's review: (1) the sufficiency of the evidence; (2) whether the trial court erred by denying various pre-trial motions; (3) whether the trial court erred by failing to continue the case after the events of September 11, 2001; (4) whether the trial court erred by excusing prospective juror Pannell for cause; (5) whether the trial court erred by admitting photographs of the victim; (6) whether the trial court erred by admitting items from Defendant's prior federal trial arising out of the robbery; (7) whether the trial court erred in restricting the Defendant's impeachment of Angela Jackson; (8) whether the trial court erred in failing to voir dire a prospective witness regarding her relationship with defense witness Russell Carpenter; (9) whether the trial court erred in sustaining an objection to the testimony of John Hibbler; (10) whether the trial court erred in permitting testimony regarding fingerprints despite stipulation; (11) whether the trial court erred in the admission of expert testimony; (12) whether the trial court erred by failing to charge lesser-included offenses of felony murder; (13) whether the trial court erred by failing to charge the jury with an accomplice instruction; (14) whether it was plain error for the State to refer to Thomas and Bond as "Greed and Evil" in opening statement and closing argument; (15) whether the trial court erred in permitting the State to argue that the jury had a job to find the Defendants guilty; (16) whether the trial court erred by not instructing

---

4. In his reply brief, Defendant Thomas makes vague references to his equal protection rights having been violated upon his case's MVU designation. He cites us to no cases in support of this proposition, however. Accordingly, this "issue" is waived. *See* Tenn. Ct.Crim. App. R. 10(b).

on specific mitigating factors; (17) whether the trial court erred by permitting the State to cross-examine the Defendant's mother regarding disciplinary actions taken against the Defendant while in prison; (18) whether the verdict of the jury was against the weight of the evidence; (19) whether the indictment failed to charge a capital offense; (20) whether the death penalty violates international treaties ratified by the United States; (21) whether the Tennessee death penalty scheme is unconstitutional; and (22) whether the sentence is proportionate. Defendant Bond raises the following issues: (1) whether it was error for the trial judge to fail to recuse himself for failure to follow Local Rule 4.01; (2) whether the trial court erred by overruling Bond's objection to the testimony of Dr. Smith; (3) whether the trial court erred by declaring Dr. Smith an expert in firearms identification; (4) whether the trial court erred by permitting the prosecution to engage in improper argument; (5) whether the trial court erred by permitting the prosecution to elicit testimony from Angela Jackson regarding her attendance at trial; and (6) whether the trial court erred by failing to instruct the jury as to lesser-included offenses of felony murder. After review of the record and the applicable law, we find no errors of law requiring reversal as to Defendant Thomas. Accordingly, we affirm the jury's verdict finding Defendant Thomas guilty of first degree murder. Additionally, we affirm the jury's imposition of the sentence of death as to Defendant Thomas. However, with respect to Defendant Bond, we are unable to conclude that the failure of the trial court to instruct the jury as to the lesser-included offenses of felony murder was harmless beyond a reasonable doubt. Accordingly, we vacate Defendant Bond's conviction for felony murder and accompanying sentence

of life without the possibility of parole. With respect to Defendant Bond, this matter is remanded to the trial court for a new trial.

Tenn. R.App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as to Defendant Thomas; Reversed and Remanded as to Defendant Bond

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. JOE G. RILEY, J., filed an opinion concurring in part and dissenting in part.

Lorna S. McClusky and Howard Manis, Memphis, Tennessee (at trial and on appeal), for the appellant, Anthony Bond.

Michael E. Scholl and Jeffery Glatstein, Memphis, Tennessee (at trial), for the appellant, Andrew Thomas.

Robert Brooks, Memphis, Tennessee (on appeal), for the appellant, Andrew Thomas.

Paul G. Summers, Attorney General and Reporter; Alice B. Lustre, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### [Deleted: Summary of Facts and Testimony]

### Issues Raised by Defendant Thomas

#### I. Sufficiency of the Evidence

■■■ Defendant Thomas asserts that the trial court erred by failing to grant a motion for a directed verdict and judgment of acquittal following the conclusion of the State's proof and at the end of the trial. The duty of the trial judge and

the reviewing court on the determination of a motion for a judgment of acquittal is the same as on a motion for a directed verdict. *See State v. Torrey,* 880 S.W.2d 710, 712 (Tenn.Crim.App.1993). This Court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Thompson,* 88 S.W.3d 611, 614–15 (Tenn.Crim.App.2000). Moreover, "[a] motion for a judgment of acquittal made at the conclusion of the proof by the state is waived when the defendant elects to present evidence on his own behalf." *State v. Ball,* 973 S.W.2d 288, 292 (Tenn. Crim.App.1998). Accordingly, we will address the Defendant's complaints as a challenge to the sufficiency of the evidence.

When an accused challenges the sufficiency of the evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. *See State v. Morris,* 24 S.W.3d 788, 795 (Tenn.2000). Moreover, we note that a guilty verdict can be based upon direct evidence, circumstan-

tial evidence, or a combination of direct and circumstantial evidence. *See State v. Pendergrass,* 13 S.W.3d 389, 392–93 (Tenn. Crim.App.1999). Furthermore, while a guilty verdict may result from purely circumstantial evidence, in order to sustain the conviction the facts and circumstances of the offense "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford,* 225 Tenn. 478, 470 S.W.2d 610, 612 (1971).

To obtain a conviction for first degree felony murder, the State must prove the "killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy[.]" Tenn.Code Ann. § 39–13–202(a) (1997). In this case, the proof at trial established that the victim, James Day, was shot in the back of the head during the commission of a robbery. The proof further established that the injuries sustained by the victim as a direct result of the gunshot wound ultimately led to the victim's death. Therefore, the crime of first degree felony murder was established.

Defendant Thomas' challenge to the sufficiency of the evidence is three-fold. He asserts that (1) Angela Jackson's testimony establishing the identity of Defendant Thomas as the perpetrator is not reliable; (2) the discrepancy in the testimony of the State's medical experts as to the source of bacteria which eventually caused the death of the victim creates a reasonable doubt as to the causation of the victim's death; and (3) witness Richard Fisher identified Bond and then Thomas as the passenger in the getaway vehicle. We will address the first and third of these assertions together, and

then turn to Defendant Thomas' contention regarding causation.

## A. Identification of Defendant Thomas as the perpetrator

Identification of a defendant as the person who committed the offense for which he or she is on trial is a question of fact for the jury's determination upon consideration of all competent proof. *See State v. Strickland*, 885 S.W.2d 85, 87 (Tenn.Crim.App.1993). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *See State v. Evans*, 838 S.W.2d 185, 191 (Tenn.1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *See id.*

Defendant Bond admitted that he and another person took part in the robbery of the Loomis Fargo truck and that James Day was shot during the robbery. It is undisputed that a car, matching the description of a vehicle belonging to Defendant Thomas' ex-wife, Angela Jackson, was seen parked a short distance from the crime scene and that Defendant Thomas and another person were observed getting into the vehicle and driving away. It is undisputed that Defendant Thomas, who was unemployed at the time, purchased a vehicle, jewelry, a shotgun, clothing, and opened a savings account within forty-eight hours of the robbery of the Loomis Fargo carrier. Angela Jackson identified her ex-husband in stills taken from the surveillance tape of the shooting. Ms. Jackson related that, while watching a news report on the robbery, Defendant Thomas remarked that he "grabbed the nigger by the throat and shot him."

Defendant Thomas points to Ms. Jackson's testimony that he and Defendant Bond returned to her residence between noon and 12:30 p.m. on the day of the robbery. However, the State proved that Mr. Day was robbed and shot between 12:30 and 1:00 p.m. Thus, he argues, the same testimony identifying him as the perpetrator also makes it "factually impossible" for him to have committed the crime. We are not convinced. Any discrepancy in Ms. Jackson's testimony relating to her report of the time that Defendant Thomas and Defendant Bond arrived at her apartment with the proceeds from the robbery and the actual time of the robbery is not fatal to the identification of Defendant Thomas as the perpetrator. The choice of which witnesses to believe and which to disbelieve is a matter entrusted to the jury. *See Bolin v. State*, 219 Tenn. 4, 405 S.W.2d 768, 771 (1966). Furthermore, the jury is free to believe portions of a witness' testimony and to disbelieve other portions. *See Wilson v. State*, 574 S.W.2d 52, 55 (Tenn.Crim.App. 1978). Additionally, Ms. Jackson's testimony as to the events immediately following the robbery were corroborated by other witnesses.

Moreover, while it is true that Mr. Fisher initially identified Defendant Bond as the person he observed in the passenger side of the white getaway car, Mr. Fisher, upon request, reexamined both defendants and changed his identification to Defendant Thomas. Defendant Thomas challenged the identification on cross-examination. The jury was present during the identification and then the re-identification. The jury was in the best position to determine the credibility of this witness. Moreover, the identity of the shooter versus the driver is irrelevant, considering the

theory of criminal responsibility, for purposes of determining guilt of the offense of felony murder. *See* Tenn.Code Ann. § 39–11–402. Irregardless of this identification, there was ample evidence from which any rational trier of fact could conclude, beyond a reasonable doubt, that Defendant Thomas was guilty of first degree felony murder committed during the perpetration of a robbery. This issue has no merit.

### B. Cause of victim's death

Defendant Thomas claims that discrepancies between the testimony of Drs. Smith and Gardner mandate a reversal of his conviction for felony murder. Both Drs. Smith and Gardner concluded that the victim died from sepsis due to a rupture of the bladder resulting from a gunshot wound to the head. The alleged discrepancy in their testimony arises in their disparate opinions as to how the bacteria that resulted in sepsis was introduced to the victim's body.

Dr. O.C. Smith testified that he had no opinion as to where the bacteria came from and that there were several potential sources for the bacteria. Dr. Smith surmised that the bacteria leading to the infection could have existed prior to the rupture of the bladder, could have been a result of the catheterization, or could have been the result of an infection of the urinary tract near the skin opening. However, Dr. Smith concluded that the "neurogenic bladder and ... the fact that he has problems with bladder control ... combined with the requirement for catheterization ... predispose[d] [the victim] ... to have a high risk of colonization and an increased risk of infection." Dr. Cynthia Gardner, Dr. Smith's assistant, testified that "[i]t probably was—I would say with ninety-nine percent certainty, the bacteria was introduced into the bladder through catheterization." Defendant Thomas contends that this "discrepancy" raises sufficient doubt as to the cause of death of the victim. We disagree.

Both doctors testified as to the injuries sustained by the victim when he was shot and the impact of the injuries upon the victim during the intervening period until his death. Any alleged "conflict" as to the source of the bacteria is insignificant. From the testimony of both medical examiners, it appears to this Court that the infection would not have occurred but for the victim's medical condition directly caused by the shooting of the victim on April 21, 1997. That is, the uncontradicted medical testimony established that the victim eventually died as a result of the gunshot wound inflicted during the robbery. Accordingly, the evidence of causation is sufficient to support the verdict of guilt and this issue is without merit.

## II. Pretrial Motions

### A. Motion to charge jury with presumption of sentencing

Defendant Thomas asserts that the trial court erred in refusing to charge the jury that it must presume that a life sentence would be served or that the death penalty would be carried out. He argues that absent such an instruction there is a "substantial probability" that jurors would improperly speculate on the consequences of their verdict.

This is not a novel issue. Our supreme court has held that the after-effect of a verdict is not a proper consideration for the jury. *See State v. Payne*, 791 S.W.2d 10, 21 (Tenn.1990), *aff'd*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The court has ruled that it is not error for a trial court to refuse to charge the jury with the very instruction requested by Defendant Thomas. *See, e.g., State*

*v. Caughron,* 855 S.W.2d 526, 543 (Tenn.), *cert. denied,* 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993); *Payne,* 791 S.W.2d at 21. Accordingly, Defendant Thomas is entitled to no relief on this ground.

### B. Motion for procedure governing jury composition

Defendant Thomas next contends that the trial court erred when it denied his motion for separate juries for the guilt and sentencing phases of trial. We disagree. The trial court does not have any discretion to grant a motion for separate juries for the guilt and sentencing phases of trial. *See State v. Dellinger,* 79 S.W.3d 458 app. at 478 n. 1 (Tenn.), *cert. den.* 537 U.S. 1090, 123 S.Ct. 695, 154 L.Ed.2d 635 (2002). Indeed, Tennessee law specifically requires that following a conviction for first degree murder, a "sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt." Tenn.Code Ann. § 39–13–204(a). Moreover, our supreme court has previously rejected this argument. *See Dellinger,* 79 S.W.3d app. at 478–79; *State v. Harbison,* 704 S.W.2d 314, 318 (Tenn.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986) (rejecting the argument that a defendant is denied a fair trial by the systematic exclusion of jurors who are against the death penalty); *see also State v. Hall,* 958 S.W.2d 679 app. at 717 (Tenn.1997) (rejecting the argument that the manner of selecting "death qualified" jurors results in juries that are prone to conviction).

Defendant Thomas also contends that a criminal defendant's constitutional rights are violated by excusing prospective jurors for cause when their personal beliefs concerning the death penalty would prevent or substantially impair their performance as a juror in accordance with their instructions and their oath. This issue, similarly, has been decided adversely to the Defendant. *See Dellinger,* 79 S.W.3d app. at 479 n. 2; *State v. Hutchison,* 898 S.W.2d 161, 167 (Tenn.1994), *cert. den.* 516 U.S. 846, 116 S.Ct. 137, 133 L.Ed.2d 84 (1995), (citing *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)). Accordingly, Defendant Thomas is entitled to no relief on these grounds.

### C. Motion to declare Victim's Rights Bill unconstitutional

Defendant Thomas asserts that Tennessee Code Annotated section 39–13–204(c), which allows the introduction at sentencing of "victim impact" evidence, violates the constitutional doctrine of separation of powers. This identical argument is raised by Defendant Thomas in his general challenge to the constitutionality of the Tennessee death penalty statutes. We reject this claim. *See infra* Section XVII (J).

### D. Motion to dismiss indictment based on common law "one year and one day rule"

Defendant Thomas moved the trial court to dismiss the indictment based upon the common law year-and-a-day rule because the victim's death occurred more than one year and one day after the crime was committed. The common law rule no longer applies in Tennessee. *See State v. Rogers,* 992 S.W.2d 393, 401 (Tenn.1999). This claim is without merit.

### E. Motion to use jury questionnaires including specific questions about the death penalty

Defendant Thomas filed a motion for a jury questionnaire specifically including death penalty questions. The trial court permitted a jury questionnaire to be used but declined to include death penalty ques-

tions. Defendant Thomas claims that, in so doing, the trial court erred.

The trial court committed no error in denying Defendant Thomas' request. A trial court is vested with great discretion in determining how voir dire examination will be conducted, and the court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of the discretion. *See State v. Howell,* 868 S.W.2d 238, 247 (Tenn.1993), *cert. den.* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994); *State v. Harris,* 839 S.W.2d 54, 65 (Tenn.1992), *cert. den.* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). We find no abuse of discretion in the method of voir dire employed in this case.

### F. Motion to dismiss on double jeopardy grounds

Defendant Thomas asserts that his trial in state court violates the double jeopardy provisions of the Fifth Amendment to the United States Constitution, Article 1 section 10 of the Tennessee Constitution, and Article 14 section 7 of the International Covenant on Civil and Political Rights because the Defendant's federal charges arise from the same criminal event.

It is a well-established principle that "a federal prosecution does not bar a subsequent state prosecution of the same person for the same acts, and a state prosecution does not bar a federal one . . . [P]rosecutions under the laws of separate sovereigns do not, in the language of the Fifth Amendment, 'subject [the defendant] for the same offence to be twice put in jeopardy.' " *United States v. Wheeler,* 435 U.S. 313, 317, 98 S.Ct. 1079, 1082–83, 55 L.Ed.2d 303 (1978). Defendant Thomas argues, however, that the dual sovereignty doctrine is violative of the Tennessee con-

stitution and argues for its abrogation. However, our supreme court has specifically upheld and determined to adhere to this doctrine of dual sovereignty, reasoning as follows:

There is no question but that such a procedure does not subject the defendant to double jeopardy insofar as the guaranty of due process in the 14th amendment of the federal constitution is concerned. *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). While the rationale of this case—that the state and federal governments are distinct sovereignties, and thus the punishment of a single act by ach is not double jeopardy—has been criticized, a similar approach has provided the basis for a more recent case, which would imply that *Bartkus'* analysis of the issue is still valid. *See United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). This court is bound by the decisions of the United States Supreme Court concerning the proper interpretation of the federal constitution. *Townsend v. Clover Bottom Hospital and School,* 560 S.W.2d 623 (Tenn.1978).

The double jeopardy provision of the Tennessee constitution, Article I, § 10, affords the defendant no greater protection. In the past, this provision has been interpreted to permit successive state and federal prosecutions on the basis of the same "dual sovereignties" analysis employed in *Bartkus,* supra, and, given the need for stability in constitutional interpretation, we see insufficient cause to depart from that precedent now.

*Lavon v. State,* 586 S.W.2d 112, 113–14 (Tenn.1979). The *Lavon* court further explained that any modification or abandonment of the dual sovereignty doctrine must be accomplished through legislative action. *See id.* at 115. Such legislative action has

yet to take place; thus, the doctrine of dual sovereignty remains in effect.

Additionally, Defendant Thomas asserts that the State's prosecution violates the International Covenant on Civil and Political Rights (ICCPR), which is an international treaty of governing nations. This Court addressed and rejected this identical claim in *State v. Carpenter,* 69 S.W.3d 568, 578–579 (Tenn.Crim.App.2001), *cert. den.* 535 U.S. 995, 122 S.Ct. 1557, 152 L.Ed.2d 480 (2002). Defendant Thomas has not convinced this Court to sway from this decision. This claim is without merit.

### III. Continuance of Case Due to Events of September 11, 2001

On September 12, 2001, the trial court continued the trial in this matter until September 17, 2001. Defendant Thomas maintains that the trial court erred by failing to continue the matter for a longer period of time following the events of September 11, 2001.

The granting of a continuance rests within the sound discretion of the trial court. *See State v. Russell,* 10 S.W.3d 270, 275 (Tenn.Crim.App.1999). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. *See id.* "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." *State v. Hines,* 919 S.W.2d 573, 579 (Tenn.1995).

In the present case, the trial court's denial of a continuance was not error. The trial was scheduled to begin on September 10, 2001. On September 10, 2001, eleven jurors were tentatively selected and the matter continued to September 11 for a second day of jury selection. Although not evidenced by the record, September 11, 2001, is the date of the terrorist attacks on New York City and Washington, D.C. On September 11, 2001, eighteen jurors were tentatively selected. At some point on that day, defense counsel moved for a continuance. The trial court continued the trial until September 17. While the events of September 11, 2001, were of unquestionable national importance, Defendant Thomas fails to explain how those events affected his trial. Nothing in the record before us indicates that those events had any effect on the proceedings other than to delay them for one week. Thus, Defendant Thomas has failed to show how he was prejudiced by the trial court's refusal to grant a continuance for a longer period of time. We find neither error nor abuse of discretion. This issue is without merit.

### IV. [Deleted: Excused Prospective Juror]

### V. Photographs of Victim

#### A. Photograph of Victim While Alive

Defendant Thomas submits that it was error for the trial court to permit introduction of a photograph of the victim while alive. At trial, defense counsel objected to introduction of the photograph. The photograph was taken after the April 1997 shooting but prior to the victim's death in October 1999. The trial court overruled the objection stating:

> I think it's, first of all, relevant in that the state, of course, has the burden of proving that an individual—a living, breathing, human being was killed in these events. And the photograph, itself, is again, a very neutral one. It's black and white. It doesn't have family members around. He's not in a choir robe or a scout uniform or military uni-

form or anything of that sort. This is a very neutral sort of photograph—no wheelchair—nothing that would be designed to elicit sympathy.... I'll allow it to be used.

During the guilt phase of the trial, the photograph of the victim was introduced through the testimony of Betty Gay, an employee of Walgreens. On appeal, Defendant Thomas contends that admission of an 8 by 10 black and white photograph of the victim taken during his lifetime was introduced for the sole purpose of invoking the sympathy of the jury and was error. The State responds that the photograph was relevant to rebut Defendant Thomas' defense that it was Mr. Day's physical health, including obesity, that caused his death, rather than the gunshot.

■ The admission of photographs is generally discretionary with the trial court and absent an abuse of that discretion, will not result in the grant of a new trial. *See State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978). In *State v. Nesbit*, 978 S.W.2d 872 at app. 901–02 & n. 2 (Tenn. 1998), *cert. den.* 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999), a capital case involving almost the identical issue, our supreme court adopted this Court's conclusion that, although the requirement of a reasonable creature in being has been removed from the current criminal code, admission of a family portrait of the victim was not error because it was relevant to establish the *corpus delicti*, including the identity of the person alleged to have been killed. In *Bolden v. State*, 140 Tenn. 118, 120, 203 S.W. 755 (Tenn.1918), our supreme court held that the evidence necessary "to establish the *corpus delicti* in cases of homicide must show that the life of a human being has been taken, which question involves the subordinate inquiry as to the *identity* of the person charged to

have been killed ...." (emphasis added). Thus, the photograph was relevant and we find no reversible error in its admission during the guilt phase of the trial.

### B. Photographs of Victim Post–Mortem

■ During the re-direct examination of Faye Day, the victim's widow, the State introduced two post-mortem photographs depicting the victim's face and back respectively. The State asserted that the photographs were relevant in light of Mrs. Day's testimony describing how her husband "blew up" shortly before his death and in light of questions by defense counsel regarding the victim's obesity. The trial court, reflecting upon Mrs. Day's testimony, permitted introduction of the photographs, finding:

> I think in light of her testimony regarding his condition those last couple of days, I think they're relevant at this point—the probative value clearly outweighs whatever prejudicial effect there would be. There's nothing graphic or bloody[.]

Defendant Thomas now contends that admission of these photographs was error. Without reference to the specific photographs complained of and without argument to those photographs actually introduced, Defendant Thomas complains that the "gruesome photographs of the victim violates the Defendant's rights under the federal and state constitutions...." The State properly argues that Defendant Thomas has waived this issue for failure to offer citation to the record. *See* Tenn. Ct.Crim.App. R. 10(b). Notwithstanding procedural waiver of this issue for noncompliance with the Rules of this Court, we elect to address the issue on its merits.

■ As previously stated, Tennessee courts have liberally allowed the admission of photographs in both civil and criminal cases. *See Banks*, 564 S.W.2d at

949. Accordingly, the admissibility of photographs lies within the discretion of the trial court whose ruling will not be overturned on appeal except upon a clear showing of an abuse of discretion. *See id.; see also State v. Hall,* 8 S.W.3d 593, 602 (Tenn.1999), *cert. denied,* 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. *See State v. Vann,* 976 S.W.2d 93, 102 (Tenn.1998), *cert. denied,* 526 U.S. 1071, 119 S.Ct. 1467, 143 L.Ed.2d 551 (1999); *State v. Braden,* 867 S.W.2d 750, 758 (Tenn.Crim.App.1993); *see also* Tenn. R. Evid. 401, 402. Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character. *See Banks,* 564 S.W.2d at 950–51.

▮▮▮▮ Notwithstanding this broad interpretation of admissibility, evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. *See id.* Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. *See Vann,* 976 S.W.2d at 102–03; *see also* Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"). In this respect, we note that photographs of a murder victim are prejudicial by their very nature. However, prejudicial evidence is not *per se* excluded; indeed, if this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence which is *unfairly* prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. *See Banks,* 564 S.W.2d at 951.

▮▮▮▮ The Defendant asserts that post-mortem photographs of the victim should not have been admitted because they were especially gruesome and inflammatory. The purpose for introducing photographs into evidence is to assist the trier of fact. "As a general rule, the introduction of photographs helps the trier of fact see for itself what is depicted in the photograph." *State v. Griffis,* 964 S.W.2d 577, 594 (Tenn.Crim.App.1997). The trial court ultimately determined that the photographs were relevant to support Mrs. Day's testimony regarding the victim's condition during the last days of his life. Dr. Gardner, likewise, used the photographs during her testimony to illustrate that the victim suffered from extensive fluid retention at the time of his death. The photographs further refuted the theory of the defense that the victim's death was the result of his obesity. We conclude that the photographs were relevant to supplement the testimony of the victim's wife and the medical examiner. Although the photographs are not particularly pleasant to view, neither are they particularly gruesome. We find that the probative value of the photographs is not outweighed by their prejudicial effect and the trial court did not abuse its discretion in allowing their admission. *See Banks,* 564 S.W.2d at 949. Defendant Thomas is not entitled to relief on this issue.

## VI. Evidence from Federal Proceedings

Defendant Thomas raises several claims of error arising from the admission of evidence that was also used in his prior federal trial. First, Defendant Thomas complains that the trial court erred in overruling his objection concerning the exhibit stickers placed on exhibits

used in Defendant Thomas' prior federal trial and further erred by not providing the jury a curative instruction. Next, he asserts as error that the trial court erred by permitting introduction of the video of the crime even though the prosecution had failed to provide a proper foundation or chain of custody for the admission of the videotape. Third, Defendant Thomas contends that the trial court erred by permitting the jury to read a transcript of Mr. Day's previous testimony as Assistant United States Attorney Tony Arvin read the transcript aloud. Next, Defendant Thomas contends that the date of Defendant Bond's guilty plea and the later date of Mr. Day's testimony provided the inference that the federal proceeding went forward against Defendant Thomas without Defendant Bond. Finally, Defendant Thomas complains that the trial court erred by overruling his objections to Defendant Bond's counsel asking questions regarding Bond's guilty plea in federal court. As argument on these claims, Defendant Thomas makes the general assertion that this evidence was not relevant. The State asserts that Defendant Thomas has waived these claims for failing to make proper argument. *See* Tenn. Ct.Crim.App. R. 10(b). Additionally, the State contends that Defendant Thomas has failed to demonstrate that the trial court abused its discretion with respect to the admission of any of this evidence. The State's position is well-taken. Nonetheless, we elect to review the admission of the contested evidence on its merits.

Rulings on the admissibility of evidence based on its relevance are entrusted to the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn.1997). "[A]n appellate court should find an abuse

of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn.1997).

### A. Evidence stickers from federal proceeding.

Initially, we note that Defendant Thomas fails to reference the record regarding objections made to the introduction of exhibits that had been previously used during his federal trial. The State, noting this omission, also fails to cite to the objections, if any, made. Despite the reference made at the motion for new trial hearing that this issue was thoroughly addressed at trial, this Court has been unable to locate any objections to these exhibits, although examples of the trial court's curative measures are found. Irregardless, Defendant Thomas claims that the exhibits were prejudicial because they contained exhibit stickers from the previous trial. Numerous exhibits contain stickers indicating that they had previously been exhibits. No other information is provided on the exhibit tags. Assistant United States Attorney Arvin testified that there were proceedings in federal court. With regard to Defendant Thomas, the jury did not know where or how the exhibits were used previously, the name of any other defendant, or the outcome of any hearing. In short, even if any prejudice resulted from the use of these exhibits, such prejudice was slight and did not substantially outweigh the probative value of this evidence. *See* Tenn. R. Evid. 403.

### B. Videotape of the crime

A videotape of the incident was recorded by Walgreens' security camera and was introduced at trial through the testimony of Charles Young. Defendant

Thomas objected, asserting lack of foundation and lack of chain of custody. The trial court found:

> Well, chain of custody is not relevant. It's just like with a photograph; if the witness can state that he's viewed this film, and it accurately reflects what it purports to show the[n] there is no chain of custody problem like there would be if you had drugs or something that you needed to maintain—preserve the integrity of the item. As far as foundation is concerned, [Charles Young] is the assistant manager of the store. He said he was familiar with the cameras and how they were pointed and how they operated, so I'll note your exception.

We agree with the trial court. This issue has no merit.

### C. Providing jurors with transcript

■ During the State's case-in-chief, Assistant United States Attorney Tony Arvin read to the jury a transcript of Mr. Day's testimony given on November 9th during the federal proceedings. Simultaneously, the jurors were each provided a copy of the transcript to read. Although Defendant Thomas conceded that the reading of Mr. Day's prior testimony was permissible, he objected to the handing of the transcript to the jury. The trial court responded, "this is not Mr. Day testifying; it's a bit harder for jurors, I think, to follow because it's some sort of neutral presentation of what is otherwise testimony; and so I think it will aid—in my opinion, it will aid the jury in following what is being read." Thus, the trial court overruled Defendant Thomas' objection. However, the trial court further determined that the jury was not to have a written copy with them in the jury room "because that would give undue weight to

a written document which is, in essence, testimony—nothing more nothing less."

We find no abuse of discretion in the trial court's ruling on this matter. This issue is without merit.

### D. Date of Bond's guilty plea and later date of Day's testimony, and

### E. Questioning by Bond's counsel regarding guilty plea

Defendant Bond pled guilty in federal court on November 4, 1998, to the robbery of James Day. Mr. Day subsequently testified about the robbery on November 9, 1998. At trial, Defendant Thomas was concerned that the evidence of the two dates would lead to the inference that, as of November 9, 1998, "the [federal] proceeding went forward against [Defendant] Thomas without [Defendant] Bond." Following argument by defense counsel, the trial court found, "So long as you—as long as [it] is indicated to the jury; that up until November the 4, [Bond] was, indeed, a party to the [federal] proceeding. At that time he entered a guilty plea to these events. And so at the time that Mr. Day testified on November the 9th, in light of the fact that [Bond] entered a guilty plea to these very events five days earlier, he was not, at that time, an actual party to the proceedings." With reference to an objection lodged by Defendant Thomas that this ruling "gives the indication that they were together in that proceeding and that [Defendant Bond] was able to plead guilty and that [Defendant Thomas] possibly disputed something," the trial court further found:

> First of all, the fact that the transcript contains references to the jury and even the court, I can only say that we made an effort ... to avoid referring to the previous proceeding as a trial or what the outcome might have been, who the actual parties were, what the sentence

might have been that these men received.

The references to jury and court in the transcript ... could have been addressed and could have been deleted. The entry of this testimony comes as no surprise to anyone in this courtroom. You all have had, of course, the transcript for years now, and we addressed the issue of the state's desire to enter Mr. Day's testimony.... So there's been time for you all to review and request that those matters—those references be deleted had you felt ... that it was unduly prejudicial to leave them in.

I don't think it's as prejudicial for them to have been in because we're still not referring to precisely what the proceedings [were], what the results were, or anything of that sort....

With regard to what [Defendant Bond] is asking to be allowed to ask, it's already in the record at this point.... Mr. Arvin has already testified to the date on which Mr. Bond entered his guilty plea to these events, not to a specific trial that was about to begin.... He's entered a guilty plea ... on the 4th of November ... and that Mr. Day's testimony ... occurred on the 9th of November.

. . .

And so, ... he's asking to ... re-ask what's already in the record and already before the jury ... and I don't know that there is any real prejudice to your client.

The trial court then limited the manner in which Defendant Bond could make inquiry as to Defendant Bond's status in the proceeding at the time of Mr. Day's testimony.

Again, we see no abuse of discretion in the trial court's ruling on this matter. Defendant Thomas is not entitled to relief as to these claims.

## VII. Restriction on Impeachment of Angela Jackson

Defendant Thomas complains that it was error for the court to refuse to allow Russell Carpenter and William Upchurch to testify that Angela Jackson had told them that she was going to make sure that Defendant Thomas went to jail. The State responds that this allegation is unsupported by the record.

A review of the direct examination of Russell Carpenter reveals that counsel for Defendant Thomas questioned Mr. Carpenter as to the status of the Thomas/Jackson relationship. Specifically, the following questions were posed of Mr. Carpenter:

Q: Mr. Carpenter, ... Did [Angela Jackson] threaten ... say she was going to pay Andrew Thomas back?

A: Yes, sir.

Q: Was she angry about their break-up?

A: Yes, sir.

Q: Did she make a comment that if she couldn't have him, no one else would?

A: Yes, sir.

Likewise, a review of the testimony of William Upchurch reveals that counsel for Defendant Thomas questioned Mr. Upchurch as to the status of the Thomas/Jackson relationship. Specifically, the following colloquy occurred:

Q: Did you ever hear Ms. Jackson make any statements regarding Andrew Thomas?

A: Yes.

Q: What statements?

A: Saying she were gonna pay him back.

The only objection noted in the record is the State's objection to the open-ended questions asked by defense counsel to Russell Carpenter, that is, "Did you . . . have any occasion to talk to Angela Jackson?" and "What did she say to you?" To the latter objection, the trial court stated,

I'm going to let you lead if he's going to say the same thing, basically, that others said; that she said she's going to pay him back. But to just ask an open-ended question, "What did she say?"—we might be here for three hours listening to all sorts of . . . things about a relationship that wouldn't be relevant. But with regard to that one narrow and specific comment that rebuts—or is purported to rebut what she testified to, I'll allow you to lead and get right to that.

No question was posed by defense counsel regarding Jackson's alleged threats to send Defendant Thomas to jail and the trial court did not limit the same. Any testimony of this nature was only briefly touched on by defense counsel on recross-examination of Angela Jackson. Called in rebuttal, Angela Jackson denied ever threatening to get Andrew Thomas. On recross-examination, defense counsel specifically asked Ms. Jackson regarding threats by Ms. Jackson that she would see that Defendant Thomas went to jail.

The record does not support Defendant Thomas' claim that the trial court improperly restricted his attempt to elicit impeachment evidence against Ms. Jackson. This claim is without merit.

## VIII. Refusal to Voir Dire Juror Regarding Relationship with Witness

After the jury returned its verdicts but prior to the penalty phase, Defendant Thomas alerted the trial court that one of the jurors worked with defense witness Russell Carpenter. The trial judge responded that he

[did not] think that the defense witnesses were mentioned during voir dire in terms of asking the jurors whether they knew potential witnesses.

. . .

And so that certainly can't be held against the juror. I mean she didn't refuse to reveal any knowledge of a relationship to any of your witnesses because those witnesses were never [identified] during voir dire . . . [f]or them to respond to. And if it's just a matter of her having worked with this witness, who wasn't actually a fact witness. His role was very minimal.

The following colloquy then occurred:

MR. SCHOLL: Everybody stop just for a second. Not my client, the juror and one of the witnesses know each other. That came to me through my client—the information.

MS. NICHOLS: Have you talked to Mr. Carpenter—how he found out or something that—

MR. SCHOLL: Evidently Mr. Bond and Mr. Thomas both talked to Mr. Carpenter, and Mr. Carpenter said that he knew this person. And that's the extent of it.

THE COURT: Okay. Just for the record, though, because I clearly misunderstood you when you first—

MR. SCHOLL: I'm sorry.

THE COURT: I thought your client knew him. I thought your client's relatives knew them, I thought there was an actual relationship there. But none of that's true. The sole statement is that your witness, Russell Carpenter, who was the final witness for the defense . . . [w]orked with this juror at one time.

MR. SCHOLL: Right, and knows her.

THE COURT: And knows her and didn't particularly get along well with her.

MR. SCHOLL: Right.

. . .

MS. MCCLUSKEY: Anthony Bond talked to Mr. Carpenter on the phone last night, and Mr. Carpenter said he's apparently seen that woman before because one day when Mr. Carpenter was being dropped off at work or dropped off from work, Mr. Bond was there. And Mr. Carpenter was saying, "That woman doesn't like me, and she saw me with you before."

THE COURT: Well, that's—there's no mention, there again, of the witnesses during voir dire. There's nothing to suggest that this juror cannot be, has not been totally fair and impartial in this case, and so I'll note your statements for the record, but I don't think it has any bearing or effect, whatsoever, on this case.

Defendant Thomas now claims that the trial court erred in failing to conduct a voir dire of this juror. Specifically, Thomas alleges that this juror should have been individually voir dired regarding her knowledge of the defense witness and her ability to be impartial. The State responds: first, the issue is waived because Defendant Thomas never requested that the juror be individually voir dired, *see* Tenn. R.App. P. 36(a); second, the issue is waived for failing to preserve the issue in the motion for new trial, *see* Tenn. R.App. P. 3(e); and third, the issue is waived for failing to make an offer of proof through the testimony of Russell Carpenter, *see* Tenn. R.App. P. 36(a); *State v. Powers*, 101 S.W.3d 383, 415 n. 5 (Tenn.2003).

 The State's position regarding waiver is well-taken. Additionally, Defen-

dant Thomas, while stating general propositions of law regarding voir dire, fails to relate to this Court why the trial court's failure to individually voir dire this juror is error. *See* Tenn. R.App. P. 27(a)(7). Notwithstanding waiver, there is nothing in the record to indicate that the juror withheld information from the court regarding an alleged relationship with witness Carpenter. Moreover, the relationship remains just that, an allegation. Defendant Thomas failed to make an offer of proof supporting his allegation. This issue is without merit.

## IX. Testimony of John Hibbler

During its case-in-chief, the State called John Hibbler as a witness. Mr. Hibbler is the owner of the car lot where Defendant Thomas purchased his pink box Chevy immediately following the robbery and shooting of James Day. On cross-examination, Defendant Thomas sought to elicit information regarding problems he and Angela Jackson were having in their marriage. The State objected and Defendant Thomas responded that the testimony was relevant to rebut the anticipated testimony of Angela Jackson. The trial court found that, should Mr. Hibbler recall Defendant Thomas mentioning marital difficulties with Ms. Jackson, that testimony would be hearsay. The following questioning then occurred:

Q: Mr. Hibbler, as I was asking before, you had conversations with Mr. Thomas after the sale of this car. Is that right?

A: Yes. I had conversations with him.

Q: And the conversations with Mr. Thomas, he asked you if he could get a new title for that car because he was having problems with the title. Is that correct?

MS. WEIRICH: Object, Your Honor, to hearsay.

THE COURT: Sustained. Isn't that what we just discussed?

A bench conference ensued, during which the trial court sustained its prior ruling that knowledge of marital difficulties between Defendant Thomas and Angela Jackson obtained during Mr. Hibbler's discussion with Thomas constituted hearsay.

On appeal, Defendant Thomas complains that the trial court erroneously concluded that Mr. Hibbler's testimony about Thomas' marital problems with Ms. Jackson was hearsay. Thomas asserts that such statements were not offered for the truth of the matter asserted but merely to show the subject of the conversation. The State responds that, if the testimony was offered to show the subject of the conversation, such statement was not relevant to any issue regarding the robbery and murder of James Day.

 Our Rules of Evidence provide that "[h]earsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). If an out-of-court statement is not offered to prove the truth of the matter asserted, such as a statement offered for impeachment purposes, it is not hearsay. *See State v. Howell,* 868 S.W.2d 238, 252 (Tenn.1993), *cert. den.* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." *State v. Stout,* 46 S.W.3d 689, 697 (Tenn.2001). Accordingly, this Court will not reverse a trial court's ruling regarding the admission or exclusion of hearsay evidence absent a clear

showing that it abused its discretion. *See id.*

 Testimony regarding possible bias of a witness is admissible pursuant to Tennessee Rule of Evidence 616 which provides that "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616. However, although extrinsic evidence is admissible to prove bias or prejudice, Defendant Thomas cites no cases from any jurisdiction, and we have found none, holding that witness bias may be proven by hearsay. If the testimony of Mr. Hibbler was offered to establish Ms. Jackson's prejudice against Defendant Thomas, it was hearsay. Thus, the trial court did not abuse its discretion by refusing to permit introduction of hearsay testimony regarding marital difficulties between Defendant Thomas and Angela Jackson.

## X. Fingerprint Testimony

As his next claim of error, Defendant Thomas asserts that the trial court erred in permitting Officer Sims to testify despite stipulation that the fingerprint found on the stolen getaway car matched Defendant Bond. Thomas asserts that, after the stipulation, any testimony by the fingerprint expert was cumulative. The State responds that Defendant Thomas has waived this issue by failing to enter a contemporaneous objection to Officer Sims' testimony. *See* Tenn. R.App. P. 36(a). The State further contends that, although Defendant Bond did object to Officer Sims offering any testimony in lieu of the agreed upon stipulation, the objection by a co-defendant fails to preserve the issue on appeal for Defendant Thomas. *See State v. Steve Bradford,* No. 03C01–9607–CR–00278, 1998 WL 24417, at *6 (Tenn.Crim.App., Knoxville, Jan. 20, 1998).

Although the State's position is well-taken, we elect to review the issue on its merits.

The trial court, in response to the expressed objections of Defendant Bond, found:

> I think that the state has a definite interest in demonstrating to the jury not only the specific facts involved here—that the print does belong to your client, but also the larger fact that—who the police officers were that worked on the case, the fact that the police were working on the case, the fact that all of this was a coordinated effort by police officers, lest some suggestion be made, in final argument, that the police dropped the ball.... I think the state has an interest in putting on proof to satisfy the jury that things were done and done right by the proper personnel. And so to that extent, I think there is an interest ... in at least putting a face with a name. By having Mr. Sims take the stand, the jury can see that Sergeant Hulley was accurate when she stated it was forwarded on to latent prints, and he can state—identify the exhibit as the one he examined. And then the stipulation can kick in, and he doesn't have to go any further than that.

After the stipulation was introduced, Officer Sims testified briefly to explain the nature of a latent print and the process by which he receives prints for review. He further related that not all prints that are lifted have value in the sense that they can be matched.

As previously indicated, "[t]he admissibility of evidence is generally within the broad discretion of the trial court; absent an abuse of that discretion, the trial court's decision will not be reversed." *State v. Edison*, 9 S.W.3d 75, 77 (Tenn.1999). We review this issue, therefore, under an abuse of discretion standard.

Defendant Thomas complains that Officer Sims' testimony was cumulative with regard to the stipulation as to Defendant Bond's fingerprints. To the extent that Sims' testimony was cumulative, if at all, we cannot conclude that the testimony was unfairly prejudicial to Defendant Thomas. Accordingly, the trial court did not abuse its discretion in permitting introduction of the testimony.

## XI. Failure to Charge Accomplice of Angela Jackson

Next, Defendant Thomas complains that the trial court erred by failing to instruct the jury with an instruction concerning accomplice testimony with regard to Angela Jackson. At the close of proof, defense counsel requested that an accomplice instruction be provided with regard to Angela Jackson. The trial court denied the request, finding that Angela Jackson failed to fit the legal definition of an accomplice, in that there was no proof that she united with Defendant Thomas in the commission of the crime. Although the court recognized that Ms. Jackson did participate in the spending of the money after the fact, the court noted that this was not enough to elevate Ms. Jackson to accomplice status.

"An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn.Crim.App. 1997). The test generally applied in determining whether a witness is an accomplice is whether the alleged accomplice could be indicted for the same offense charged against the defendant. *See id.* In this state, if the offense in question was not committed by the person's own conduct, the person may, nonetheless, be criminally responsible as a principal to the offense if the person solicits, directs, aids, or attempts to aid another person to commit

the offense. *See* Tenn.Code Ann. § 39–11–402(2). The proof in this case fails to establish that Angela Jackson solicited, directed, aided, or attempted to aid the Defendant in committing murder and/or aggravated robbery. Her actions in allowing the Defendant into her home after the crimes were committed, going shopping with the stolen money and receiving part of the proceeds for herself, do not make her a principal to the offense of murder or robbery of the victim. Thus, the Defendant's argument that it was error for the trial court not to submit an accomplice instruction to the jury is without merit, because the facts do not demonstrate that Angela Jackson was an accomplice.

## XII. Failure to Instruct on Specific Mitigators

Next, Defendant Thomas complains that the trial court declined to instruct the jury as to the following non-statutory mitigating circumstances: (1) residual doubt as to the defendant's guilt; (2) the defendant was the product of a dysfunctional family subject to abuse; (3) the defendant had a history of family instability; (4) the defendant had a fundamental lack of a stable relationship with his parent or step-parent; (5) his parents were divorced; (6) any regret for his past acts; (7) his family could not feed itself on its own; and (8) any positive influence he may have had on others. A review of the charge submitted to the jury reveals that the trial court instructed the jury as to the following mitigating circumstances:

(1) Whether he was the product of a dysfunctional family subject to abuse.

(2) Any history of family instability.

(3) Any proof of abandonment by a significant family member.

(4) Any evidence to show that one [of] his parents was an abuser of drugs.

(5) Any difficulty with parents' divorce or separation of parents.

(6) Any active relationship that he may have with his child although in jail.

(7) Any proof that shows that he has family members that will provide him with love and support while in prison.

(8) Any proof that, although he is in jail, he provides love and support to other members of his family.

(9) Any positive relationship that he had with other adults and children.

(10) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

The charge reveals that five out of the eight requested instructions were provided to the jury. The factors not specifically included in the charge are: (1) residual doubt, (2) the family's inability to feed itself, and (3) the Defendant's regret for past acts.

With respect to the first of these factors, the Eighth Amendment of the United States Constitution does not require a lingering or residual doubt instruction. *See Franklin v. Lynaugh,* 487 U.S. 164, 173–74, 108 S.Ct. 2320, 2326–28, 101 L.Ed.2d 155 (1988). In *Franklin,* the United States Supreme Court stated:

Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because "residual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. "Residual

doubt" is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty." ... Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing.

*Id.* at 188, 108 S.Ct. 2320 (O'Connor, J., concurring) (citations omitted). *See also State v. Bigbee,* 885 S.W.2d 797, 813 (Tenn. 1994). Accordingly, the trial court did not commit a federal constitutional error in denying Defendant Thomas' request for an instruction on lingering or residual doubt.

 Defendant Thomas argues that the trial court was required to grant his request for this instruction under state law. Our supreme court has determined that residual doubt is a nonstatutory mitigating circumstance. *See State v. McKinney,* 74 S.W.3d 291, 307 (Tenn.2002); *State v.Hartman,* 42 S.W.3d 44, 55–56 (Tenn. 2001). Our criminal code provides, in relevant part, that

> The trial judge shall also include in the instructions for the jury to weigh and consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing, or both, which shall include, but not be limited to, those circumstances set forth in subsection (j).

Tenn.Code Ann. § 39–13–204(e)(1).[1] Thus, where the issue of residual doubt is raised by the evidence, a jury instruction is appropriate. *See State v. Odom,* 928 S.W.2d

18, 30 (Tenn.1996). Such evidence "may consist of proof ... that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase." *McKinney,* 74 S.W.3d at 307. In this case, Defendant Thomas testified that he did not commit the murder of James Day. Therefore, the trial court should have provided the jury an instruction on residual doubt.

 Our supreme court has concluded that a convicted defendant's right to have the jury instructed on nonstatutory mitigating circumstances is statutory rather than constitutional in nature and thus, the failure to instruct the jury on nonstatutory mitigating circumstances when raised by the evidence is subject to harmless error analysis. *See State v. Hodges,* 944 S.W.2d 346, 351–52 (Tenn.), *cert. den.* 522 U.S. 999, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997). "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* at 352. However, if "by their breadth, the instructions on nonstatutory mitigating circumstances encompassed all the evidence presented by the defense," the omission of an instruction on a specific mitigating circumstance is harmless. *Id.* at 356.

 Here, the trial court instructed the jury to consider "any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence." This broad instruction encompassed Defendant Thomas' denial of guilt and served to give the jury the opportunity and duty to consider any residual doubts

---

1. I have urged adopting a protocol in which each case would be compared to factually similar cases in which *either* a life sentence or capital punishment was imposed to determine whether the case is more consistent with "life" cases or "death" cases. *See State v. McKinney,* 74 S.W.3d at 321 (Birch, J., concurring and dissenting). The current protocol allows a finding proportionality if the case is similar to existing *death penalty* cases. In other words, a case is disproportionate only if the case under review "is plainly lacking in circumstances consistent with those in similar cases in which the *death penalty* has been imposed." *Bland,* 958 S.W.2d at 665 (emphasis added).

about his culpability. Accordingly, we are confident that the trial court's failure to give a specific instruction on residual doubt had no effect on the jury's verdict, and Defendant Thomas is therefore entitled to no relief on this claim.

With regard to Defendant Thomas' regret for past acts and his family members' alleged inability to feed themselves, the trial court found that the testimony did not demonstrate regret for past acts. Rather, Defendant Thomas' mother testified that he had apologized for bringing his family down. Additionally, when asked whether Thomas had ever spoken of bringing down Faye Day's family, Ms. Barber responded, "The only thing—he told me that he was charged with this armored driver and that a man died from it." The trial judge concluded, "I don't even really remember any—any statements by the mother that he's shown any real regret for any past acts.... I didn't hear any inkling of remorse about any of those [prior aggravated robbery convictions]." Regarding the fact that his family members are unable to feed themselves, the trial court found there was no proof to support this instruction. Accordingly, these circumstances were not raised by the proof and the trial court did not err by failing to so instruct. Even assuming error, any such error was harmless given that the trial court did provide the jury with the catch-all instruction as to mitigating circumstances. It is clear that the trial court's refusal to instruct the jury as to Defendant Thomas' alleged regret for past acts and his family members' alleged inability to feed themselves did not result in an instruction that failed to fairly submit the legal issues or misled the jury as to the applicable law. Defendant Thomas is not entitled to relief on this claim.

## XIII. Improper Cross–Examination of Defendant's Mother

During the penalty phase of the trial, the State sought to cross-examine Defendant Thomas' mother, Luella Barber, regarding a disciplinary write-up he received while in jail. The trial court permitted the questioning, finding, "I think that's appropriate because that has a direct bearing on what she's testified to with regard to him being a good person or whatever.... I'll allow you to ask about the jail incident." The State proceeded with the following questioning of Luella Barber:

Q: Okay. Are you aware of an incident that occurred in the jail back on June 7th of 2001 of this year?

A: An incident—

Q: Involving Andrew Thomas?

A: No, I'm not.

Q: Where he was part of a strip search that they do to the inmates, and they found a six-and-a-half-inch shank on him.

A: I don't work here, so I don't know.

Q: You didn't know anything about that?

A: No one ever notified me about that[.]

Mrs. Barber testified that knowledge of this incident would not change her opinion as to her son. Defendant Thomas complains that this line of questioning was error because it was more prejudicial than probative.

Our criminal code provides that the rules of evidence do not limit the admissibility of evidence in a capital sentencing proceeding. *See* Tenn.Code Ann. § 39–13–204(c). *See also Stout*, 46 S.W.3d at 702. The supreme court has interpreted section 39–13–204(c) as permitting trial judges wider discretion than would normally be allowed under the Tennessee Rules of Evidence in ruling on the admissi-

bility of evidence at a capital sentencing hearing. *See State v. Sims,* 45 S.W.3d 1, 14 (Tenn.), *cert. den.* 534 U.S. 956, 122 S.Ct. 357, 151 L.Ed.2d 270 (2001). As the *Sims* court stated,

> The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

45 S.W.3d at 14. The questioning was relevant to rebut testimony about Defendant Thomas' positive character traits, including allegations by Mrs. Barber that Defendant Thomas attempted to improve himself while incarcerated. Thus, Defendant Thomas is not entitled to relief on this claim.

### XIV. Failure to Act as 13th Juror

Defendant Thomas also argues that the verdict was contrary to the weight of the evidence and the trial court, acting as thirteenth juror, should have overturned the verdicts. Tennessee Rule of Criminal Pro-

cedure 33(f) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Our supreme court has explained that "Rule 33(f) imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case. . . ." *State v. Carter,* 896 S.W.2d 119, 122 (Tenn.1995).

When the trial judge simply overrules a motion for new trial, this Court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict. *See id.*

In the instant case, the trial court simply overruled the Defendant's motion for new trial without making any comments regarding a dissatisfaction with the weight of the evidence. Thus, this Court presumes that the trial court acted as thirteenth juror and approved the verdicts of the jury. Because the record contains no statements by the trial court expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or indicating that the trial court misunderstood its role as thirteenth juror, this Court will not grant the defendant a new trial on this basis. *See State v. Moats,* 906 S.W.2d 431, 435–36 (Tenn.1995).

### XV. Indictment Failed to Charge Capital Offense

Defendant Thomas asserts that, pursuant to *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the indictment against him did not charge a capital offense and that he cannot, therefore, be sentenced to more than life imprisonment. Defendant's argument is based upon the premise that first degree murder is not a capital offense unless accompanied by aggravating factors. Essentially, Defendant Thomas complains that the indictment returned by the grand jury charges non-capital first degree murder

because the grand jury did not find any capital aggravating circumstances. That is, Defendant Thomas alleges that to satisfy the requirements of *Apprendi*, the indictment must include language of the statutory aggravating circumstances to elevate the offense to capital murder. Because of this omission in the indictment, he argues that the State was then precluded from filing a Rule 12.3 notice of intent to seek the death penalty, which provides that a notice of intent to seek the death penalty may be filed "[w]here a capital offense is charged in the indictment or presentment." Tenn. R.Crim. P. 12.3(b). Defendant Thomas asserts that, since a capital offense was not charged in the indictment, the State could not then rely upon aggravating factors to enhance his sentence to death.

Our supreme court has recently ruled that "the principles of *Apprendi* do not apply to Tennessee's capital sentencing procedure. Neither the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution." *Dellinger*, 79 S.W.3d at 467. Thus, Defendant Thomas is not entitled to relief on this ground.

## XVI. Tennessee's Death Penalty Scheme Violates International Treaties

Defendant Thomas next asserts that Tennessee's imposition of a death penalty violates United States treaties and hence the federal constitution's Supremacy Clause.[2] Defendant Thomas claims that the Supremacy Clause was violated when his rights under treaties and customary international law to which the United States is bound were disregarded. Specifically, his argument is based upon two primary grounds: (1) customary international law and specific international treaties prohibit capital punishment, and (2) customary international law and specific international treaties prohibit reinstatement of the death penalty by a governmental unit once it has been abolished. This identical argument has recently been rejected by panels of this Court in *State v. Richard Odom*, No. W2000–02301–CCA–R3–DD, 2002 WL 31322532, at *32–35 (Tenn.Crim.App., Jackson, Oct. 15, 2002), and *State v. Robert Faulkner*, No. W2001–02614–CCA–R3–DD, 2003 WL 22220341, at *31 (Tenn.Crim.App., Jackson, Sept. 26, 2003). We see no viable reason to resolve this issue in a different manner in the present case. Defendant Thomas is not entitled to relief on this issue.

## XVII. Tennessee's Death Penalty Scheme is Unconstitutional

The Defendant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions. Included within his claim that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and Article I, Sections 8, 9, 16, and 17, and Article II, Section 2 of the Tennessee Constitution, are the following:

A. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants. Specifically,

---

**2.** In my view, excluding from comparison that group of cases in which the State did not seek the death penalty, or in which no capital sentencing hearing was held, frustrates any meaningful comparison for proportionality purposes. *See Bland*, 958 S.W.2d at 679 (Birch, J., dissenting). This case, in particular, is a prime example of the arbitrariness of this protocol.

the statutory aggravating circumstance set forth in Tennessee Code Annotated section 39–2–203(i)(2), (i)(5), (i)(6), and (i)(7) have been so broadly interpreted whether viewed singly or collectively, that they fail to provide a meaningful basis for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death.

We note that factors (i)(5), (i)(6) and (i)(7) do not pertain to this case as they were not found by the jury. Thus, any individual claim with respect to these factors is without merit. *See, e.g., Hall,* 958 S.W.2d app. at 715; *State v. Brimmer,* 876 S.W.2d 75, 87 (Tenn.), *cert. denied,* 513 U.S. 1020, 115 S.Ct. 585, 130 L.Ed.2d 499 (1994). Also, this argument has been rejected by our supreme court. *See Vann,* 976 S.W.2d app. at 117–118; *State v. Keen,* 926 S.W.2d 727, 742 (Tenn.1994).

B. The death sentence is imposed capriciously and arbitrarily in that

(1) Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty.

This argument has been rejected. *See State v. Hines,* 919 S.W.2d 573, 582 (Tenn. 1995), *cert. denied,* 519 U.S. 847, 117 S.Ct. 133, 136 L.Ed.2d 82 (1996).

(2) The death penalty is imposed in a discriminatory manner based upon race, geography, and gender.

This argument has been rejected. *See State v. Cazes,* 875 S.W.2d 253, 268 (Tenn. 1994), *cert. den.* 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995).

C. There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter.

This argument has been rejected. *See Cazes,* 875 S.W.2d at 269.

D. The death qualification process skews the make-up of the jury and results in a relatively prosecution-prone, guilt-prone jury.

This argument has been rejected. *See State v. Reid,* 91 S.W.3d 247 app. at 313 (Tenn.2002), *cert. den.* 540 U.S. 828, 124 S.Ct. 56, 157 L.Ed.2d 52 (2003), and cases cited therein.

E. Defendants are prohibited from addressing misconceptions about matters relevant to sentencing.

This argument has been rejected. *See id.*

F. Requiring the jury to agree unanimously to a life verdict violates *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) and *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

This argument has been rejected. *See Reid,* 91 S.W.3d app. at 313.

G. There is a reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances.

This argument has been rejected. *See id.*

H. The jury is not required to make the ultimate determination that death is the appropriate penalty.

This argument has been rejected. *See id.*

I. The defendant is denied final closing argument in the penalty phase of the trial.

This argument has been rejected. *See id.*

J. Mandatory introduction of victim impact evidence and mandatory introduction of other crime evidence upon the prosecutor's request violates separation

of powers and injects arbitrariness and capriciousness into capital sentencing.

This argument has been rejected by a panel of this Court. *See State v. Robert Faulkner,* No. W2001–02614–CCA–R3–DD, 2003 WL 22220341, at *36–37 (Tenn. Crim.App., Jackson, Sept. 26, 2003).

K. The appellate review process in death penalty cases, including comparative proportionality review, is constitutionally inadequate.

This argument has been rejected. *See Reid,* 91 S.W.3d app. at 313. Moreover, our supreme court has held that, while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required. *See State v. Bland,* 958 S.W.2d 651, 663 (Tenn.1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998).

## XVIII. [Deleted: Mandatory Proportionality Review]

## [Deleted: Issues Raised by Defendant Bond]

## Issues Jointly Raised by Both Defendant Thomas and Defendant Bond

### I. Unconstitutional Selective Prosecution

The major violators unit, MVU, was created by federal grant in the 1970s in response to a need in Shelby County to target repeat offenders. The judges of the Shelby County Criminal Court agreed that MVU cases should be handled by a specific judge in a specific courtroom. Once an offender is designated MVU by the District Attorney General, the case is automatically assigned to Division V of the Shelby County Criminal Court. This program gives the District Attorney discretion to designate any defendant with multiple felony convictions an MVU case, after which one prosecutor is designated to remain with the case through final disposition. Rather than dividing the management and responsibility for a case among numerous prosecutors as it moves through pre-trial and trial, this vertical method of prosecution avoids excessive delay and promotes the more efficient prosecution of repeat offenders. Under LEAA(Law Enforcement Assistance Agency) grants in the 1970s, one courtroom was established to handle MVU cases. One court was to handle the MVU cases for expediency and purposes of judicial economy.

Defendants Thomas and Bond raise several complaints arising from their designation as an MVU case. Specifically, Defendant Thomas asserts that, because his case was classified by the office of the District Attorney General as a major violator, multiple violator, or MVU case prior to indictment, the prosecution, in effect, directed the Shelby County Criminal Court Clerk's Office to assign this case to Division V of the Criminal Court. Accordingly, he alleges that the District Attorney engages in unconstitutional selective prosecution and is in violation of Rule 4 of the Rules of Practice and Procedure in the Criminal Courts of Shelby County. Defendant Bond claims that the trial court's failure to require assignment under Rule 4.01, Local Rules of Shelby County Criminal Court, violated his constitutional rights. At the trial level, Defendant(s) sought relief in the form of (1) dismissal of the indictment due to unconstitutional selective prosecution, (2) recusal of the trial court due to acquiescence in the prosecution's disregard of Rule 4.01, and (3) removal of the District Attorney General for the 30th Judicial District. The trial court, in ruling on the Defendants' motions, found, in relevant part:

I just truly believe that even taking all of the defendant's factual assertions as being completely true, that their motions are without merit, they're not well-taken, and that there's no purpose to be served by taking proof in this case. I'll accept everything they say as being true with regard to the procedures that are followed—in terms of designating cases for MVU in terms of having the grand jury funnel the MVU cases to Division V. But even with all of those facts being the case, I think the law is still very well settled that that procedure does not violate equal protection or due process in any regard.

. . .

But the same principle—so you don't have prosecutors running to ten or twelve different courts, prosecutors that handled [certain types of cases] can go to one or two courts. Those judges can familiarize themselves with sentencing alternatives. And it's that type of principle, I think, that has been in existence with regard to major violators since its inception in the mid to late 70s; and I think there are sound reasons for it, sound public-policy reasons, sound legal reasons; and absent any showing of specific denial of due process or equal protection, any specific prejudice resulting from the fact that these individuals are in this division of court set for trial, the process itself, I don't think, can be assailed given the case law that allows it and supports it and states that there is no constitutional deprivation with this type of system.

Local Rule 4.01, Rules of the Shelby County Criminal Court, provides:

The following method will be employed by the Criminal Court Clerk's Office for the initial assignment of cases to the ten divisions of Court. The following types of cases will be assigned to the ten divisions of court in numerical order beginning with Division I through X as the indictments are filed in the Criminal Court Clerk's Office. This procedure shall be used in the following types of cases: Murder in the First Degree, Attempt Murder in the First Degree, Conspiracy to Commit First Degree Murder, Second Degree Murder, Aggravated Kidnapping, Especially Aggravated Robbery, Aggravated Rape, Aggravated Arson, Aggravated Robbery, Rape, Aggravated Sexual Battery, Voluntary Manslaughter, Vehicular Homicide, Kidnapping, Robbery, Spousal Rape and Incest. All other cases will be divided equally among the ten divisions of the Court. All salary petitions filed by the Criminal Court Clerk and the Sheriff will be heard by the Administrative Judge.

Rule 4.05, Rules of the Shelby County Criminal Court, provides:

The judges may transfer cases among themselves by mutual consent. It is not necessary that the parties or their counsel consent to such transfer. A party requesting a transfer of a case from one division to another division shall obtain an order from the Court to which the case is assigned, transferring the case to another division.

Defendants contend that the MVU classification violates Rule 4.01. We conclude otherwise. Rule 4.05 specifically permits judges of the Shelby County Criminal Court to transfer cases among themselves by mutual consent. It appears from the findings of the trial court that the judges of Shelby County by mutual consent have had in place a system for more than twenty years in which MVU defendants would be tried in one particular division of the court. There is no right, constitutional or otherwise, bestowed upon a

criminal defendant by Rule 4.01. Indeed, a defendant does not have the right to have his case heard by a particular judge, *see Sinito v. United States,* 750 F.2d 512, 515 (6th Cir.1984), neither does he have the right to any particular procedure for the selection of a hearing judge, *see Cruz v. Abbate,* 812 F.2d 571, 574 (9th Cir.1987), nor does he enjoy the right to have a judge selected by a random draw, *see Sinito,* 750 F.2d at 515. Rather, the rule appears to be an administrative rule created to ensure an even distribution of cases among the various divisions of the Shelby County Criminal Court.

■ Practical realities dictate the allocation of limited public resources. Accordingly, "our courts must afford public officials substantial discretion with regard to law enforcement decisions." *State v. Harton,* 108 S.W.3d 253, 261 (Tenn.Crim.App. 2002) (citing *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)). We recognize, however, that the classification of a defendant as a major violator and the subsequent assignment of MVU cases to one division of court implicates issues of selective prosecution and due process on the judicial assignment phase of adjudication.

■ The Due Process Clause imposes strict neutrality requirements on officials performing judicial or quasi-judicial functions. *See Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982). Those requirements are not applicable to those acting in a prosecutorial or plaintiff-like capacity. *See Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). "In an adversary system, [prosecutors] are necessarily permitted to be zealous in their enforcement of the law." *Id.* When prosecutorial rather than judicial functions are involved, the constitu-

tional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated. *See id.*

In light of the role that prosecutors play as advocates, at least two state courts have concluded that judicial assignment systems allowing prosecutors to select the judge assigned to a particular case violate due process. In *State v. Simpson,* 551 So.2d 1303 (La.1989) *(per curiam )*, the defendant filed an application for a supervisory writ seeking reassignment of his case to another judge. Noting that the prosecutor and the defense attorney had stipulated that in the Louisiana district at issue, the prosecution was allowed to select the judge who presided over criminal cases, the Louisiana Supreme Court granted the writ. The court reasoned:

> To meet due process requirements, capital and other felony cases must be allotted for trial to the various divisions of the court, or to judges assigned criminal court duty, on a random or rotating basis or under some other procedure adopted by the court which does not vest the district attorney with power to choose the judge to whom a particular case is assigned.

*Id.* at 1304 (footnotes omitted). The *Simpson* court based this conclusion on the concept that "[d]ue process of law requires fundamental fairness, *i.e.,* a fair trial in a fair tribunal." *Id.* (citing *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *State v. Mejia,* 250 La. 518, 197 So.2d 73 (1967)). The court noted decisions from other jurisdictions concluding that courts may utilize different methods of assigning criminal cases to judges, but observed that these decisions do not stand for the proposition that the prosecutor may assign cases to the judge of his or her choice. *Id.* at 1304 n. 3.

In an earlier decision, a New York state court took a similar approach. In *McDonald v. Goldstein*, 191 Misc. 863, 83 N.Y.S.2d 620 (N.Y.Sup.Ct.1948), the court rejected a district attorney's challenge to an order divesting his office of its long-accepted authority to select judges for criminal cases. *See id.* at 622 (noting that "[t]he District Attorney for some time past has selected the judge in each case by moving indictments for trial directly to the several parts of the court."). The court based its ruling on general principles of judicial independence, noting that judges should be free from outside control, especially by any of the litigants. *See id.* at 625 ("It is the people's prerogative, not the District Attorney's to say who will preside over the County Court of Kings County.").

In contrast to *Simpson* and *McDonald*, most federal courts that have addressed the issue of prosecutorial involvement in judicial assignments have not found due process violations. In *Tyson v. Trigg*, 50 F.3d 436, 439–42 (7th Cir.1995), *cert. den.* 516 U.S. 1041, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996), (*Tyson II*), the most recent and thorough of these federal decisions, the Seventh Circuit rejected an argument raised in a habeas corpus proceeding that the case assignment system in an Indiana state court violated the defendant's due process rights. The system in question allowed the prosecutor to select one of six grand juries to which a proposed indictment would be presented. Each grand jury was assigned to a specific judge, and thus, by selecting the grand jury, prosecutors implicitly chose the judge to which the case would be assigned. The habeas petitioner in *Tyson II* did not argue that the

assigned judge was prejudiced against him. Instead, he asserted that to allow the prosecutor to pick the judge so greatly stacks the deck against the defendant as to make the trial unfair—so unfair as to deny due process of law. *Id.* at 439.

The Seventh Circuit rejected that argument.[3] First, it noted a lack of precedent holding that prosecutorial steering could constitute a due process violation warranting the reversal of a conviction. Additionally, it concluded that the fact that the prosecutor might gain a certain advantage over the defendant in being allowed to select the judge did not render the trial fundamentally unfair. *See id.* at 440–41. It reasoned that the American system of criminal procedure is not balanced equally between the prosecution and the defense at every stage, but rather represents an aggregate of imbalances. *Id.* at 440. Thus, prosecutors have certain advantages in the investigative stage and in impeaching witnesses, while the rules on burdens of proof favor defendants. *See id.* Absent any allegation that the judge selected by the prosecutor was actually biased against the defendant, the imbalance caused by the Indiana system was not so egregious as to affect the fairness of the trial.

Several other federal courts have held that, in order to establish a due process violation for prosecutorial judge-shopping, a defendant must demonstrate actual prejudice by the assignment of a particular judge to his case. For example, in *United States v. Gallo*, 763 F.2d 1504, 1532 (6th Cir.1985), *cert. den.* 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986), the Sixth Circuit rejected the defendant's argument that he was entitled to a new trial because the prosecutors had engaged in a pattern

---

**3.** As I stated in my concurring/dissenting opinion in *State v. Godsey*, "[t]he scope of the analysis employed by the majority appears to be rather amorphous and undefined—expand-ing, contracting, and shifting as the analysis moves from case to case." 60 S.W.3d 759, 797 (Tenn.2001)(Birch, J., concurring and dissenting).

of steering significant criminal cases to the judges of their choice. *See id.* The court relied on its earlier decision in *Sinito v. United States, supra,* in which it had held that due process concerns were not implicated by a clerical error resulting in the assignment of a case to a different judge than would have sat absent the error. *See Gallo,* 763 F.2d at 1532. The *Sinito* panel had concluded that "a defendant does not have the right to have his case heard by a particular judge," does not "have the right to have his judge selected by a random draw," and "is not denied due process [when the selection process is not operated in compliance with local rules] ... unless he can point to some resulting prejudice." *Sinito,* 750 F.2d at 515. The *Gallo* panel found this reasoning dispositive, rejecting the defendant's argument because he had not alleged that the trial judge was in any way disqualified to hear his case. 763 F.2d at 1532. Several other decisions have similarly required a showing of prejudice. *See, e.g., United States v. Erwin,* 155 F.3d 818, 825 (6th Cir.1998), *cert. den.* 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999); *United States v. Osum,* 943 F.2d 1394, 1401 (5th Cir.1991).

■■■ Although all of these decisions offer helpful and relevant analysis, they differ from the instant case. First, we hesitate to conclude that the designation of a criminal defendant as a major violator by the District Attorney General and his Assistants constitutes judge-shopping. Once a defendant is determined to qualify as a major violator, the District Attorney does not select what division to which the case

will be assigned. Rather, it appears that the judges of the Shelby County Criminal Court specifically designated Division V to hear such cases. Notwithstanding, even if we were to consider this process judge-shopping, we are also cognizant that the judge assigned to MVU cases has been sworn to uphold the law and defend the Constitution, and his or her conduct can be scrutinized through appellate review. We presume honesty and integrity in those acting as adjudicators. *See Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Thus, we refuse to presume that the judge assigned to MVU designees acts as an agent of the prosecutor. Additionally, it does not appear to this Court that the designation of Division V as the MVU court necessarily results in a court in which the determination of guilt or innocence cannot reliably be made.

■■■ Finally, Defendants have failed to establish that they were prejudiced by the assignment of their case to Division V. Accordingly, we cannot conclude that the Defendants were deprived of a fair trial by assignment to Division V nor do we conclude that by assigning MVU defendants to Division V, the Shelby County Courts are in violation of Local Rule 4.01. This issue is without merit.[4]

## II. Propriety of State's Argument to Jury

■■■ The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." *Smith v. State,* 527 S.W.2d 737, 739 (Tenn.1975). Attorneys have great leeway in arguing before

---

4. I also note that in a recent study on the costs and the consequences of the death penalty conducted by the State Comptroller, one of the conclusions was that prosecutors across the state are inconsistent in their pursuit of the death penalty, a fact that also contributes to arbitrariness in the imposition of the death penalty. *See* John G. Morgan, Comptroller of the Treasury, *Tennessee's Death Penalty: Costs and Consequences* 13 (July 2004), *available at www.comptroller.state.tn.us/orea/reports.*

a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. *See Terry,* 46 S.W.3d at 156. However, closing argument must be temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried. *See Russell v. State,* 532 S.W.2d 268, 271 (Tenn.1976). The State is more limited in its prerogative due to the prosecutor's role as a seeker of justice, rather than a mere advocate. *See Coker v. State,* 911 S.W.2d 357, 368 (Tenn.Crim.App. 1995), *overruled on other grounds, State v. West,* 19 S.W.3d 753 (Tenn.2000). "Thus, the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Id.* Prosecutorial misconduct during argument does not constitute reversible error unless it appears that the outcome was affected to the defendant's prejudice. *See State v. Bane,* 57 S.W.3d 411, 425 (Tenn.2001).

Both Defendants contend that the prosecutor's opening statement and closing arguments were so marred by misconduct as to require a new trial. We note first, however, that Defendant Thomas and Defendant Bond's failure to object to opening and closing argument at trial waives our consideration of this issue on appeal. *See* Tenn. R.App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); *State v. Little,* 854 S.W.2d 643, 651 (Tenn.Crim.App.1992) (holding that the defendant's failure to object to the State's alleged misconduct during closing argument waives that issue). Thus, where a prosecuting attorney makes allegedly objectionable remarks during closing argument, but no contemporaneous objection is made, the complaining defen-

dant is not entitled to relief on appeal unless the remarks constitute "plain error." *See* Tenn. R.App. P. 36(b); Tenn. R.Crim. P. 52(b); *State v. Smith,* 24 S.W.3d 274, 282 (Tenn.2000). In determining whether an alleged trial error constitutes "plain error," we consider five factors: 1) the record must clearly establish what occurred at trial; 2) a clear and unequivocal rule of law must have been breached; 3) a substantial right of the defendant must have been adversely affected; 4) the defendant did not waive the issue for tactical reasons; and 5) consideration of the error is "necessary to do substantial justice." *See State v. Adkisson,* 899 S.W.2d 626, 641–42 (Tenn.Crim.App. 1994). Ultimately, the error must have "had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Id.* at 642.

## A. Greed and Evil

The prosecutor for the State who made opening statement in this case began, "You can't hide from greed and evil. James Day learned that lesson on April 21st, 1997...." She continued: "James Day learned you can't hide from greed and evil," and "He walked into the path of greed and evil." Throughout opening statement, the prosecutor referred collectively to Defendant Thomas and Defendant Bond as "greed and evil." This theme was repeated during closing argument, in which both prosecutors made references that "James Day couldn't hide from greed and evil," "there was no hiding from or escaping the circle of greed and evil," and "greed and evil really didn't care that day whether he lived or died." The prosecutors referred to the Defendants as "greed and evil" a total of twenty-one times during the opening statement and closing arguments of the guilt phase of the trial. Defendant Thomas and Defendant Bond, neither of whom entered a contemporane-

ous objection to these statements, ask this Court to find plain error in the State's conduct. *See* Tenn. R.Crim. P. 52(b).

It is improper for the prosecutor to use epithets to characterize a defendant. The prosecutors' repeated references to Defendant Thomas and Defendant Bond as "greed and evil" was improper. *See, e.g., Cauthern,* 967 S.W.2d at 737 (evil one); *State v. Bates,* 804 S.W.2d 868, 881 (Tenn.1991) (rabid dog); *State v. Ladonte Montez Smith,* No. M1997–00087–CCA–R3–CD, 1999 WL 1210813, at *12 (Tenn.Crim.App., Nashville, Dec. 17, 1999) (guilty dog); *State v. Joel Guilds,* No. 01C01–9804–CC–00182, 1999 WL 333368, at * 5 (Tenn.Crim.App., Nashville, May 27, 1999) (this clown). When a prosecutor engages in improper argument, we must also consider the curative measures taken by the court and/or the prosecution; the prosecutor's intent in making the improper remarks; the cumulative effect of the erroneous statements and any other errors in the record; and the relative strength or weakness of the case. *See Bigbee,* 885 S.W.2d at 809; *State v. Buck,* 670 S.W.2d 600, 609 (Tenn.1984).

Here, we find the prosecutors' comments unseemly but harmless in the context of the entire argument. No curative instruction was provided primarily because neither Defendant Thomas nor Defendant Bond objected to the characterization. Moreover, the State's case was strong and the effect of the error was insignificant. In short, the State's improper argument did not undermine the fundamental fairness of the trial, and we therefore conclude that this issue gains the Defendants no relief.

### B. Don't Give Defendants a Freebie

During opening statement of the penalty phase, counsel for Defendant Thomas stated, "[Defendant] Thomas will never get out of jail. He'll be in there, at the earliest, until he's eighty." In response to this statement, the prosecutor began her closing argument with,

> I'm going to start off this morning by apologizing ... for wasting your time this week because you heard it, they're both doing a lot of time already. "Why in the world are we down here? Let's just forget this murder. I'm sorry, Ms. Day, James Day's death should be a freebie. I mean, they're already doing a lot of time."

Defendants contend that it was improper to argue that a defendant should be sentenced to death as additional punishment for a previous conviction. The State contends that this was a proper response to Defendant Thomas' attempt to minimize the current crime by emphasizing the penalties he already faced.

While community conscience arguments are generally improper, a prosecutor's closing argument must be evaluated in light of the defense argument that preceded it. *See Darden v. Wainwright,* 477 U.S. 168, 179, 106 S.Ct. 2464, 2470, 91 L.Ed.2d 144 (1986). Here, both Defendants ignore that it was defense counsel who first invoked community conscience by telling the jurors that Defendant Thomas had already been sentenced to a lengthy period of confinement. Obviously the prosecutor's comment was a response to that statement.

In *Darden, supra,* the Supreme Court considered the following factors in determining that the prosecutors' closing argument did not deprive the defendant of a fair trial:

> The prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent. Much of

the objectionable content was invited by or was responsive to the opening summation of the defense.... [T]he idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole. The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," reduced the likelihood that the jury's decision was influenced by argument.... "Darden's trial was not perfect—few are—but neither was it fundamentally unfair."

*Id.* at 181–83, 106 S.Ct. 2464 (citations omitted). Similar factors are present here. Doubtless the testimony of the numerous witnesses and the admission by Defendant Bond did far more to seal their fate than a single abbreviated comment by the prosecutor during closing argument. As in *Darden*, the trial may not have been perfect, but it was fair and no reversible error can be predicated on the prosecutor's closing argument.

### III. Admission of Expert Testimony

Defendant Thomas complains that the trial court committed several errors with regard to the admission of expert testimony. Specifically, Defendant Thomas complains (1) Dr. Gardner should not have been permitted to testify and make comments regarding the victim's therapy, (2) Dr. Smith should not have been permitted to provide opinions as to the treatment of the victim immediately after the shooting, (3) Dr. Smith should not have been qualified as a ballistics expert, and (4) Dr. Smith should not have been permitted to

testify about events in the hospital immediately after the victim was shot. Defendant Bond joins Defendant Thomas' complaints regarding (1) Dr. Smith's testimony regarding the diagnosis and treatment of the victim as a living patient and (2) Dr. Smith being qualified as an expert in ballistics.

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, provided the scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue. *See* Tenn. R. Evid. 702. An expert may base his or her opinion upon facts or data imparted to or perceived by the expert prior to or at a hearing; the facts or data need not be admissible if they are the type of facts or data reasonably relied upon by experts. *See* Tenn. R. Evid. 703. If the underlying facts or data lack trustworthiness, the court shall disallow expert testimony based upon them. *See id.* Evidence and expert testimony regarding scientific theory must be both relevant and reliable before it may be admitted. *See McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 265 (Tenn. 1997). The trial court has broad discretion in resolving questions concerning the qualifications, admissibility, relevance, and competency of expert testimony. *See State v. Stevens,* 78 S.W.3d 817, 832 (Tenn. 2002). An appellate court should not overturn a trial court's decision in admitting or excluding a proposed expert's testimony unless it finds the trial court abused its discretion. *See State v. Ballard,* 855 S.W.2d 557, 562 (Tenn.1993).

### A. Dr. Cynthia Gardner

Defendant Thomas complains that Dr. Gardner's testimony concerning the victim's therapy should not have been allowed

as it was outside her field of expertise. During Dr. Gardner's direct testimony, she was questioned as to the daily regimen of care for James Day by his wife. An objection was made on the basis that Dr. Gardner is "not a health-care provider, she's not a physical therapist, she's not—doesn't have any expertise in any of these areas." The trial court sustained the objection, and instructed the prosecutor to rephrase the line of questioning. No other objections were made to this line of questioning. The State submits that Defendant Thomas has, therefore, waived any challenge to Dr. Gardner's testimony on this issue.

Dr. Gardner is a licensed medical doctor in Tennessee and is currently employed as an assistant medical examiner for Shelby County. Dr. Gardner is also an instructor in pathology for the medical school. Dr. Gardner completed her residency in anatomic and clinical pathology following medical school, then completed a fellowship in forensic pathology. Based upon her training as a medical doctor, Dr. Gardner was qualified to testify regarding catheterization. The trial court did not abuse its discretion in admitting this testimony. This claim is without merit.

### B. Dr. Smith

Defendant Thomas claims that "the trial court further erred by allowing Dr. O.C. Smith to give opinions in several areas of medicine of which he was not an expert [,][i]including, but not limited to, giving his opinion as to whether treatment was proper after the victim was shot." To the extent that Defendant Thomas fails to delineate specific grounds of error, those claims are waived. *See* Tenn R.App. P. 27(a); Tenn. Ct.Crim.App. R. 10(b). Specifically, Defendants Thomas and Bond assert two challenges to Dr. Smith's testimony: (1) Dr. Smith is not qualified to render opinions as to a living person, and (2) Dr. Smith should not have been qualified as an expert in ballistics.

### (1) Living person

Dr. Smith was asked to render an opinion as to the cause of death of the victim and whether it related to the gunshot fired by Defendant Thomas two and one-half years earlier. Determining the cause of death is the type of opinion a medical examiner is called upon to make. Dr. Smith's review of the treatment records, including assessments of James Day's injuries, was necessary to the formation of that opinion. In this regard, Dr. Smith is a licensed medical doctor in the State of Tennessee and board certified in forensic pathology, anatomical pathology, and clinical pathology. Based upon his training as a medical doctor, Dr. Smith was qualified to testify regarding the gunshot wound inflicted upon the victim, the likely results of such an injury, and the course of treatment to the victim. The trial court did not abuse its discretion in admitting this testimony. This claim is without merit.

### (2) Ballistics expert

During voir dire of Dr. Smith, Dr. Smith stated that he has previously testified as a ballistics expert. Defendant Bond objected, stating that the testimony of a ballistics expert was not relevant to the victim's cause of death. The objection was overruled. The trial court determined that a ballistics expert could "shed some light on the gunshot wound," recognizing that "the state is attempting ... to demonstrate that the gunshot is the cause—the initial event that caused his death; and to that end, I think if this witness can be qualified as a ballistics expert, his opinion may be very helpful in shedding some light on the facts of the case[.]" Dr. Smith then con-

tinued to explain the role of a ballistics expert and the training necessary to become a forensic firearms examiner. He stated that he received training in forensic firearms examination by R.A. Stindler. Objection was again made by both Defendant Bond and Defendant Thomas, on the basis that such testimony was not relevant. On appeal, Defendants complain that the qualifications of Dr. Smith as a ballistics expert were irrelevant in that no knowledge of firearms identification and analysis was introduced with his opinion as to the cause and manner of death.

Defendants are correct that there was no direct challenge to the fact that the victim was wounded by a bullet. However, the effect of the shot was crucial to the defense and the State had the burden of proving beyond a reasonable doubt that the victim's death was the result of a gunshot wound inflicted during the robbery. Dr. Smith's training in forensic firearm identification, specifically his military training involving traumatic injuries, permitted him to make the determination as to whether the shot was likely to be fatal. We cannot conclude that the trial court abused its discretion in permitting Dr. Smith to be qualified as a firearms expert. This claim is without merit.

## IV. [Deleted: Lesser-included Offenses of Felony Murder]

### Conclusion

### Defendant Thomas

Having fully reviewed the record, the briefs and the applicable authority, we affirm Defendant Thomas' conviction for first degree felony murder. Additionally, in accordance with the mandate of Tennessee Code Annotated section 39–13–206(c)(1), and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find, with regard to Defendant Thomas, that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstance, and the jury's finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt. Furthermore, our comparative proportionality review, considering both the nature of the crime and the defendant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. *See id.* § 39–13–206(c)(1)(D). Accordingly, we also affirm the sentence of death imposed on Defendant Thomas.

### [Deleted: Defendant Bond]

JOE G. RILEY, J., concurring in part and dissenting in part.

I agree with the majority opinion in all respects with one exception. The majority opinion concludes the failure of the trial court to charge the lesser-included offense of facilitation of felony murder as to Defendant Bond was not harmless error. I respectfully disagree with this conclusion.

### [Deleted]